H. W. SCHAAKE et al., Plaintiffs, v. JOSEPH N. DOLLEY et al., as The State Charter Board, etc., Defendants.

No. 17,703.

SYLLABUS BY THE COURT.

1. BANKS—*Subject to Police Power.* The business of banking is so intimately related to the public welfare that it properly falls within the scope of the police power of the state exercisable by the legislature.

2. —————— *Statute Authorizing Charter Board to Refuse Charter Valid.* Section 2. of chapter 125 of the Laws of 1911, relating to the formation of private corporations and providing that the charter board shall refuse a bank charter if upon examination it shall make a determination against the public necessity of the business in the community in which it is sought to establish the bank, is a valid enactment under the police power of the state.

3. —————— *Charter to First Applicant.* Where equally meritorious applications for charters for several banks in the same community are pending before the charter board at the same time, and the charter board determines against the necessity for more than one bank, the application first presented should be granted.

Original proceeding in mandamus. Opinion filed October 7, 1911. Writ denied.

*C. S. Crawford,* and *Frank Doster,* for the plaintiffs.

*J. W. Gleed,* and *J. L. Hunt,* for the defendants; *Gleed, Hunt, Palmer & Gleed,* of counsel.

The opinion of the court was delivered by

BURCH, J.: In May, 1911, there were three banks in the city of Abilene, two national banks and one state bank, all actively engaged in business. On May 20 an application was made to the state charter board for the incorporation of a fourth bank, to be known as the Commercial State Bank, and on May 25 an application was made for the incorporation of still another bank, to be known as the Central State Bank. The

application first presented was approved and the second one was rejected. The incorporators of the Central State Bank ask for a writ of mandamus to compel the charter board to approve its application and allow it a charter.

Section 2 of chapter 125 of the Laws of 1911, relating to the formation of private corporations, provides as follows:

"The charter board shall make a careful investigation of each application, and shall inquire especially with reference to the character of the business in which the proposed incorporation is to engage, and if the board shall determine that the business or undertaking is one for which a corporation may lawfully be formed, and that the applicants are acting in good faith, the application shall be granted, and a certificate setting forth that the application has been approved shall be indorsed upon the application and signed by the members of the charter board approving the same; provided, that when the application is for a bank charter the charter board shall also make a careful examination as to the financial standing and character of the incorporators, also of the public necessity of the business in the community in which it is sought to establish the same, and shall determine whether the capital for which said company is sought to be capitalized is commensurate with the requirements of law, and if the board shall determine either of said questions unfavorably to said corporation, it shall refuse said charter."

Pursuant to this statute the charter board made a careful examination of the public necessity for a fifth bank at Abilene and found that there was not more than enough business in that community to support four banks, and that the public necessity did not justify the establishment of a fifth bank. Having so determined, the charter board regarded the statute as mandatory.

The plaintiffs say that the right to engage in banking is a common-law right, pertaining equally to every citizen, which the legislature can not, under the state constitution, take away, and that they have been denied the equal protection of the laws guaranteed by the fed-

eral constitution, and have been deprived of property without due process of law, in violation of that instrument.

What the common-law rights of the plaintiffs may have been is not very material. That body of legal principles has been adopted in this state only so far as it is compatible with the wants and conditions of the people, and it is one of the functions of the legislature to ordain and establish, from time to time, such new rules and ordinances subversive of the common law as it may deem to be for the welfare of society under the changed and continually changing states of its composition, organization, development and progress.

The law in question does not contravene the fourteenth amendment to the constitution of the United States if it was enacted pursuant to the police power of the state, and it is justifiable as an exercise of that power if it responds directly to some demand of the public welfare and does not fall within some limitation upon legislative action expressed in the state constitution.

The article of the state constitution devoted to the subject of banking relates to banks of issue, and the only provision of that instrument pertinent to the present discussion is section 1 of the bill of rights, which reads as follows:

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

The right to liberty and the pursuit of happiness includes the right to employ one's faculties and property in a gainful occupation of his own choosing. This right, however, has never been regarded as absolute by either the English or the American law. While it is properly spoken of as fundamental and inalienable, it is nevertheless qualified to the extent that the sovereign power may interfere with its enjoyment through regulations necessary or proper for the mutual

Schaake v. Dolley.

good of all the members of the social whole. One of the highest ends of civil government is the protection of the individual in the enjoyment of the fundamental rights enumerated in the bill of rights. The idea of those rights should be pervasive in civil institutions or government is likely to become a nuisance and a scourge. But if the individual insist upon them to the detriment of other individuals possessing the same rights, or to the detriment of the security, good order, common good and general welfare of the entire social body of which he is a member, he is likely to become a nuisance. Therefore it is a principle of undisputed validity that a person's right to devote his property to a selected employment must be subordinated to such reasonable restrictions and limitations as are necessary to prevent the exercise of the right from becoming harmful to others. If the benefits of organized society are to be enjoyed at all authority must reside somewhere to consider the conflicting claims and interests of the individual and of the community to which he belongs and prescribe the rules of good neighborhood. The power to do this is legislative power, and it must necessarily be adequate to meet the need for which it is instituted. The result is that the declaration of the bill of rights quoted above is not a prohibition against just restrictions upon the enjoyment of liberty and the pursuit of happiness, in the interest of the public good. It is a political maxim addressed to the wisdom of the legislature and not a limitation upon its power. It is, not a mere "glittering generality" and can not be entirely disregarded in any valid enactment (see *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kan. 660, 665, 3 Pac. 284), but it lacks the definiteness, certainty and precision of a rule, like the command of the bill of rights respecting slavery, or religious freedom, or bail, or trial by jury, and consequently can not, as those provisions do, furnish a basis for the judicial determination of specific controversies.

"Many things, indeed, which are contained in the bill of rights, to be found in the American constitutions, are not, and from the very nature of the case can not be, so certain and definite in character as to form rules for judicial decisions; and they are declared rather as guides to the legislative judgment than as marking an absolute limitation of power. The nature of the declaration will generally enable us to determine without difficulty whether it is the one thing or the other. If it is declared that all men are free and no man can be slave to another, a definite and certain rule of action is laid down, which the courts can administer; but if it be said that 'the blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue' we should not be likely to commit the mistake of supposing that this declaration would authorize the courts to substitute their own view of justice for that which may have impelled the legislature to pass a particular law, or to inquire into the moderation, temperance, frugality and virtue of its members, with a view to set aside their action, if it should appear to have been influenced by the opposite qualities. It is plain that what in the one case is a rule, in the other is an admonition addressed to the judgment and the conscience of all persons in authority, as well as of the people themselves." (Cooley, Const. Lim., 7th ed., p. 245.)

To decide that the act in question violates the quoted section of the bill of rights would be merely to substitute the court's opinion as to the manner in which a recognized doctrine of political science should be given practical effect for the deliberate judgment of the legislature upon the subject. This the court is not authorized to do.

Ordinarily a court is not at liberty to declare a statute unconstitutional on the ground that it violates natural, social or political rights unless it can be shown that such rights are withdrawn from legislative interference by the constitution. If we go outside the constitution and appeal to any of the maxims of free government relating to the sacredness of the rights of liberty and property, we merely raise the question,

What is the scope of legislative power? Legislative power is the power to prescribe the rules of civil conduct, and the statement by Chief Justice Shaw of the supremacy of that power in the field now under consideration has never been surpassed in clearness and cogency.

"It is a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property nor injurious to the rights of the community. All property in this commonwealth, as well that in the interior as that bordering on tide waters, is derived directly or indirectly from the government, and held subject to those general regulations, which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use, whenever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same." (*Commonwealth v. Alger,* 61 Mass. 53, 84.)

All well-informed persons are now fully and keenly alive to the marvelous economic changes which the rapid industrial and commercial development of the nation in recent times has produced. New economic

forces have been evolved and the social relations of men have become complex and interdependent to a degree previously inconceivable. Numerous subjects which formerly were chiefly private, with only an incidental public aspect, have become social subjects, demanding regulation of a kind and to an extent which former conditions did not warrant. The business of banking is now clearly discriminated as belonging to the latter class.

Banks are indispensable agencies through which the industry, trade and commerce of all civilized countries and communities are now carried on. The banker is the universal broker over whose counter the exchanges of supply and demand are, in the final analysis, effected. The capital which he has invested and the returns which he receives upon it are insignificant in importance relative to the advantages which society at large derives from the conduct of the banking business, and the evil consequences of unsound banking are distributed between the banker and the general public in like proportion. Banking is not a business "affected with a public interest" in the sense in which Lord Hale first used that expression in the treatise *"De Portibus Maris."* But banking has ceased to be, if it ever was, a matter of private concern only, like the business of the merchant, and for all purposes of legislative regulation and control it may be said to be "affected with a public interest." The public patronage which the banker invites and receives is of such a character that he becomes in a just sense a trustee of the fiscal affairs of the people and of the state. If a merchant can not meet his bills promptly the general public is not disturbed. He is not ruined at once, and if he should fail the effects are limited to comparatively a few persons. If a bank is unable to meet a check drawn upon it the refusal to pay is an act of insolvency. Its doors are closed, its business is arrested, its affairs go into liquidation and the mischief

Schaake v. Dolley.

takes a wide range. Those who have been accommodated with loans must pay, whatever their readiness or ability to do so. Further advances cannot be obtained. Other banks must call in their loans and refuse to extend credit in order to fortify themselves against the uneasiness and even terror of their own depositors. Confidence is destroyed. Enterprises are stopped. Business is brought to a standstill. Securities are enforced. Property is sacrificed and disaster spreads from locality to locality. All these incidents of the banking business are matters of common knowledge and experience. They clearly distinguish banking from the ordinary private business, illustrate its public nature and show that it is properly subject to the police power of the state, vested in its legislature.

When once a subject is found to be within the scope of the state's police power the only limitations upon the exercise of the power are that regulations must have reference in fact to the welfare of society and must be fairly designed to protect the public against evils which might otherwise occur. Within these limits the legislature is the sole judge of the nature and extent of the measures necessary to accomplish its purpose. It may even go so far as to establish a monopoly. (*Slaughter-House Cases*, [16 Wall.] 83 U. S. 36; *In re Lowe, Petitioner*, 54 Kan. 757, 762, 39 Pac. 710.) It may be conceded that under the English and American law monopolies of the ordinary occupations of life are odious and illegal. But whenever, through changed social conditions or otherwise, a business becomes essentially public in character and assumes proportions, takes on features, or is attended by consequences which make free participation in it destructive of the ends for which it is pursued and a menace to the welfare of society, society, through its duly constituted authorities, may, in the absence of constitutional prohibitions, protect itself by limiting the right to engage in such business

as far as may be necessary to attain the desired security. Banks are incorporated in part for the beneficial purpose of providing safe depositaries for the people's money and credits. It would be paradoxical indeed if the right of individual liberty and property should require the state to go on incorporating banks in a given community until, through the certain operation of known economic forces, deposited money and credits would no longer be safe. The power to suppress monopoly and restore competition has never been doubted. The power is exercised for the public good, and so is justified. If the results of unrestricted competition become as pernicious as those of monopoly the same suppressing power may be exercised to the same end—the public welfare—and so be justified.

Tested by the foregoing principles the act assailed is the product of a valid exercise of the police power. It does not prohibit persons from engaging in the business of banking. The plaintiffs may, if they choose to forego the advantages of corporate organization, open a private bank. The statute merely says that the establishment of banking corporations in a given community will not be permitted beyond the public necessity of the business in that community. The mischief to be remedied is well understood. It is stated by the charter board, in its return to the alternative writ allowed in this case, as follows:

"The establishment of additional banks in a town where the business is not such as to demand or justify the establishing of such banks has a tendency to weaken and make unsafe all of the banks in said town. The division of the business is such that it is difficult for the banks to obtain the amount of deposits necessary in order to earn a return sufficient to pay expenses and a dividend on the capital, and creates a temptation to pay high and unsafe rates of interest on the deposits, and further makes it difficult for banks to loan their money to safe borrowers, and creates a tendency to lend money

to unsafe borrowers, the result of all of which is to cause unsafe banking."

Perhaps the return to the writ does not specify all the elements of public danger consequent upon free banking beyond the business necessities of a particular community, but those stated are enough to justify the legislature in interfering. The remedy proposed is neither new nor untried. It has the approval of expert economists and is constantly employed by the comptroller of the currency of the United States in regulating the business of banking under the federal law.

Banking is prohibited except upon a minimum of capital, and unless a certain reserve is maintained. The legality of these and other prohibitions is not questioned anywhere. The one under consideration is but another means to the same general end and the court has no doubt of its constitutionality. If authority be needed upon the subject it may be found in the case of *Noble State Bank v. Haskell,* 219 U. S. 104. In that case the court considered the question of the constitutional validity of a statute of Oklahoma compelling state banks to make contributions to a depositor's guaranty fund. The opinion reads:

"It may be said in a general way that the police power extends to all the great public needs. (*Camfield v. United States,* 167 U. S. 518.) It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. Among matters of that sort probably few would doubt that both usage and preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business. If, then, the legislature of the state thinks that the public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it. Even the primary object of the required assessment is not a

private benefit as it was in the cases above cited of a ditch for irrigation or a railway to a mine, but it is to make the currency of checks secure, and by the same stroke to make safe the almost compulsory resort of depositors to banks as the only available means for keeping money on hand. The priority of claim given to depositors is incidental to the same object and is justified in the same way. The power to restrict liberty by fixing a minimum of capital required of those who would engage in banking is not denied. The power to restrict investments to securities regarded as relatively safe seems equally plain. It has been held, we do not doubt rightly, that inspections may be required and the costs thrown on the bank. (See *Charlotte, Columbia & Augusta R. R. Co. v. Gibbes,* 142 U. S. 386.) The power to compel, beforehand, coöperation and thus, it is believed, to make a failure unlikely and a general panic almost impossible, must be recognized, if government is to do its proper work, unless we can say that the means have no reasonable relation to the end. (*Gundling v. Chicago,* 177 U. S. 183, 188.) So far is that from being the case that the device is a familiar one. It was adopted by some states the better part of a century ago and seems never to have been questioned until now. . . . There are many things that a man might do at common law that the states may forbid. He might embezzle until a statute cut down his liberty. We can not say that the public interests to which we have adverted, and others, are not sufficient to warrant the state in taking the whole business of banking under its control. On the contrary, we are of opinion that it may go on from regulation to prohibition except upon such conditions as it may prescribe. In short, when the Oklahoma legislature declares by implication that free banking is a public danger, and that incorporation, inspection and the above-described coöperation are necessary safeguards, this court certainly can not say that it is wrong." (pp. 111-113.)

The plaintiffs build up an argument like this: The statute does not profess negatively to guard against any public evil and does not profess affirmatively to promote any public advantage. It denies a privilege, not because it would be harmful, but because it would not be beneficial. The power given to the charter

board is to judge of the public necessity of the business in the community. This means to judge if the public welfare would be promoted, which is a vastly different thing from judging if the public welfare would be harmed. The court can not read into the statute a prohibition against something harmful; to do so would be to distort the phraseology. No statute can be upheld under the police power which prohibits a thing merely because it is useless and unnecessary, and so this statute is unconstitutional and void.

Statutes seldom extend themselves to include an express profession of purpose. Sometimes they do so in preambles reciting the conditions giving rise to them and stating the objects to be attained, but generally they merely promulgate a regulation and the mischief sought to be remedied must be judged from the state of affairs with which the statute deals. A remedial statute will not be restrained by interpretation from accomplishing beneficial results which naturally flow from the operation of its provisions. On the other hand, such a statute will be given the force and effect which the measures adopted naturally indicate, and any public evil which inheres in the state of affairs dealt with by the statute, and which the statute eradicates, will be held to be within the purview of the legislature. Such an interpretation neither reads anything into the statute nor distorts its phraseology, and besides being reasonable and sensible, and according to the accepted canons of interpretation, would be adopted if necessary to prevent the statute from conflicting with the constitution. An unnecessary bank in a community is not a thing of passive uselessness only, and so merely of no benefit. It is an active disturber of the financial peace, to the detriment of the public welfare, and it is not very material whether we say that public harm will be prevented or that public good will be promoted by its suppression.

39—85 KAN.

The plaintiffs say that the statute does not tend to prevent undue competition because private banks may be established without regard to the public necessity of the business. Competition by banks holding charters under the corporation act is certainly forestalled, and doubtless in the judgment of the legislature serious danger from the opening of private banks throughout the state is not to be feared because they must operate under all the restrictions and handicaps of incorporated institutions without possessing any of the privileges and advantages which those institutions enjoy.

The plaintiffs argue that the statute vests power in the charter board to grant or refuse applications to incorporate banks at will, without regard to any rule or fixed standard, and, should the board be so inclined, through caprice and partiality.

The statute belongs to the well-known class in which the legislature prescribes a rule to be applied according to the existence or non-existence of some fact which the officer or board called upon to administer the law is required to ascertain. The question for the charter board in any case arising under this law is, Are the banking facilities of the community adequate to the public needs? This question is to be determined like any other question of fact, from a consideration of the conditions existing in the community concerned. The board has no discretion over these conditions. It does not create them and can not modify them. It merely finds out and declares what they are, and the statute then dictates what shall be done. It is conceivable that any public trust may be abused. The courts, however, are bound to take for granted the honesty and right-mindedness of public officers chosen, directly or indirectly, by the people to administer the laws.

It is not necessary to review the authorities bearing upon this subject. It will be sufficient to consider the case made most prominent in the brief of the plaintiffs, that of *City of Sioux Falls v. Kirby,* 6 S. Dak. 62, 25

L. R. A. 621. In that case section 100 of a city ordinance provided as follows:

"Any person desiring to erect, alter or repair any building to be used exclusively not for business purposes, shall apply to said building inspector for a permit for such purpose and furnish him a written statement showing the location, dimensions and manner of construction of the proposed building, stating the material to be used, the manner of construction of chimneys and stove-pipe connections, and exhibit to said inspector any plans or specifications of the same which he may have. If satisfied that such building, alteration or repair is in compliance with the provisions of this chapter, the building inspector shall give his permit for such proposed building or structure on payment of the fees prescribed in the next section." (p. 65.)

In holding this ordinance to be invalid the court said:

"Section 100 of the ordinance does not contain any regulations to guide the landowner in the construction or alteration of a building upon his land, but requires of such landowner, before any such building can be constructed or alteration made, that he must apply to the inspector for a permit, which he is required to give when he is satisfied that such building or alteration is in compliance with the ordinance. It does not merely forbid the erection of any building that is hazardous, or which exposes property or persons to danger from fire; but it requires of the landowner that he obtain a permit from the inspector, and pay the prescribed fee therefor, which may be granted or withheld by such inspector, as he may or may not be satisfied that the building complies with the requirements of the ordinance, which, as we have seen, makes no provisions as to what shall be deemed necessary to constitute a safe construction. It is clear that the ordinance in controversy, upon its face, attempts to restrict the right of dominion, which every individual possesses over his property, not according to any general or uniform rule, but so as to make the absolute enjoyment of his own property depend upon the arbitrary will of the city inspector, and therefore makes the right of the citizen to use his property subject to the will of such inspector, from whose decision no appeal is given. Such an ordinance can not be sustained." (p. 67.)

A dissenting opinion was filed, which reads, in part, as follows:

"The majority of the court is of the opinion that this particular ordinance is invalid because it subordinates the right of the individual landowner to improve his property by building thereon, to the arbitrary will of a building inspector, in that it requires the landowner, as a condition precedent to the erection of such building, to make a statement to such inspector of the character and location of the building he proposes to erect, the material to be used, and how the chimneys are to be constructed, and then that such inspector may refuse a permit for such building, and thus prevent its erection, unless he is satisfied that such building is to be constructed 'in compliance with the provisions of this chapter.' I think the mistake of the opinion is in considering the power thus conferred upon the inspector an arbitrary one. The language of this section plainly implies that this particular provision is supplementary to other sections of this 'chapter,' which prescribe general regulations concerning material to be used, and manner of construction, and with them the statement of the landowner as to his proposed building is to be compared, and, 'if satisfied that such building is [will be] in compliance' with the requirements of such chapter, 'the inspector shall give his permit for such proposed building, on payment of the fees prescribed in the next section.' It can not be contemplated that his decision will be arbitrary or willful or capricious. It is to be the exercise of a quasi-judicial function by a sworn and bonded public officer. In this respect he is put upon the same footing as many other ministerial or executive officers who are required to pass upon acts or instruments, and govern their conduct accordingly." (p. 70.)

The majority opinion contains no discussion whatever of building regulations not contained in section 100 but appearing elsewhere in the same chapter. Whether these regulations were deemed insufficient to amount to a definite guide, or whether section 100 was regarded as not supplementary to other parts of the same chapter, can not be known. But the clear purport

of the decision is that the ordinance did not provide a standard of safe construction by which a property owner might prepare his building plans and by which the inspector should judge such plans, and that consequently the property owner was wholly at the inspector's mercy. Viewed in this light the decision is supported by the prevailing authorities. If, however, section 100 was an integral part of a chapter which elsewhere did provide a general and uniform standard of safe construction, as the dissenting opinion claims, then the decision is wrong. In that event the inspector possessed no discretion and no arbitrary power, his function being confined to satisfying himself that plans submitted to him conformed to the standard.

The plaintiffs claim that legislative power is delegated to the charter board. The argument in support of the claim is that the standard prescribed—the business necessities of the community—is no standard; what those necessities are can not be demonstrated; all the charter board can do is to express an opinion on the subject; and consequently what the legislature does is to say to the charter board, "Use your judgment about granting bank charters."

It has been well said that to deny to the legislature the right to delegate the power to determine some fact or state of things upon which the enforcement of an enactment depends would stop the wheels of government and bring about confusion, if not paralysis, in the conduct of the public business. (*Union Bridge Co. v. United States,* 204 U. S. 364, 383.) The same result would follow if it were essential that the required fact or state of things should first be capable of demonstration to a certainty admitting no difference of opinion. The statute books are full of enactments leaving to administrative officers the determination of facts depending upon elements fully as complex and intangible as those which make up the need of a community

for additional banking facilities; and when such enactments have been considered by the courts they have generally been upheld against the claim that legislative power has been delegated.

"It is further contended, however, that the statute is open to the objection that it improperly confers legislative power upon the executive council and the auditor of state. Here, again, we find no authorities which hold that the legislature can not give to executive officers a discretion in determining the conditions to be imposed on the conduct of a business which is subject to legislative control. The legislature can only pass general statutes. It can not provide for their application to particular conditions. Discretion may be conferred upon a railroad commission to fix rates of fare or freight. (*Georgia Railroad v. Smith*, 70 Ga. 694.) The board of supervisors of a county may be given the authority to fix the fees or compensation of officers. (*Ryan v. Outagamie County*, 80 Wis. 336, 50 N. W. 340.) We see no reason why the legislature can not authorize the executive council to determine whether the plan and methods in accordance with which the building and loan business is to be conducted by any particular association are fair, reasonable, and in accordance with public policy, or why the state auditor can not be authorized to fix the amount of securities which an unincorporated association desiring to conduct such business in the state shall deposit for the security of its members. It must be assumed that state officers will act fairly and impartially and in accordance with their best judgment, and statutory provisions allowing them to exercise a discretion in such action are not to be condemned as unconstitutional." (*Brady v. Mattern*, 125 Iowa, 158, 169, 100 N. W. 358.)

"That congress can not delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution. The act of October 1, 1890, in the particular under consideration, is not inconsistent with that principle. It does not, in any real sense, invest the president with the power of legislation. For the purpose of securing reciprocal trade with countries producing and exporting sugar, molasses, coffee, tea and hides, congress

Schaake v. Dolley.

itself determined that the provisions of the act of
October 1, 1890, permitting the free introduction of
such articles, should be suspended as to any country
producing and exporting them, that imposed exactions
and duties on the agricultural and other products of
the United States, which the president deemed, that is
which he found to be, reciprocally unequal and unrea-
sonable.    Congress itself prescribed, in advance, the
duties to be levied, collected and paid, on sugar, mo-
lasses, coffee, tea or hides, produced by or exported
from such designated country, while the suspension
lasted.    Nothing involving the expediency or the just
operation of such legislation was left to the determina-
tion of the president.    The words 'he may deem,' in
the third section, of course, implied that the president
would examine the commercial regulations of other
countries producing and exporting sugar, molasses,
coffee, tea and hides, and form a judgment as to
whether they were reciprocally equal and reasonable,
or the contrary, in their effect upon American prod-
ucts.    But when he ascertained the fact that duties and
exactions reciprocally unequal and unreasonable were
imposed upon the agricultural or other products of the
United States by a country producing and exporting
sugar, molasses, coffee, tea or hides, it became his duty
to issue a proclamation declaring the suspension, as to
that country, which congress had determined should
occur.    He had no discretion in the premises except in
respect to the duration of the suspension so ordered.
But that related only to the enforcement of the policy
established by congress.    As the suspension was abso-
lutely required when the president ascertained the ex-
istence of a particular fact, it can not be said that in
ascertaining that fact and in issuing his proclamation
in obedience to the legislative will, he exercised the
function of making laws.    Legislative power was ex-
ercised when congress declared that the suspension
should take effect upon a named contingency.    What
the president was required to do was simply in execu-
tion of the act of congress.    It was not the making of
law.    He was the mere agent of the law-making de-
partment to ascertain and declare the event upon which
its expressed will was to take effect."    (*Field v. Clark*,
143 U. S. 649, 692.)

These cases are sufficient to illustrate the principle involved. Many others are cited in the opinion in the case of *The State v. Railway Co.*, 76 Kan. 467, 480, 92 Pac. 606.

The plaintiffs extend some of their arguments until they reach the wisdom and policy of the law. With these the court is not concerned.

Two equally deserving applications were pending before the charter board at the same time. The statute makes no provision for a choice in such cases, and the charter board did right in granting the one first filed. If several applications of equal merit should be presented at the same instant no one could claim a preference and no injury could follow the granting of one and the rejection of the others.

The writ is denied.