No. 20,410.

PAUL A. DESSER et al., *Appellants,* v. THE CITY OF WICHITA
et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. LICENSE TAX—*"Jitneys"—Municipal Control of Public Streets.* The
provision of the ordinance in question requiring those operating any
self-propelled vehicles carrying passengers for hire to pay additional
licenses of three hundred to four hundred dollars before being per-
mitted to solicit or receive passengers on the paved portions of certain
designated streets, although practically prohibitive as to such desig-
nated places, is a valid exercise of municipal control.

2. SAME—*Benefit to Street Railway Company.* That the effect of such
ordinance if enforced would involve a benefit to the street railway
company is no reason why the city may not prescribe such regulation.

3. SAME—*When Courts Should Interfere.* Before the courts can inter-
fere with the exercise of legislative power granted to the city to
license and regulate such conveyances it must appear that the
attempted exercise of such power is flagrantly unjust, unreasonable
or oppressive.

Appeal from Sedgwick district court, division No. 2; THORN-
TON W. SARGENT, judge. Opinion filed December 11, 1915.
Affirmed.

*Fred Stanley, Claude C. Stanley,* and *Benjamin F. Hegler,*
all of Wichita, for the appellants.

*James A. Conly,* city attorney, *Kos Harris, V. Harris,* both
of Wichita, *L. S. Ferry, T. F. Doran,* and *J. S. Dean,* all of
Topeka, for the appellees.

The opinion of the court was delivered by

WEST, J.: This suit was brought to enjoin the enforcement
of an ordinance enacted by the city of Wichita prescribing
certain regulations and requiring certain licenses from persons
operating jitneys and other motor vehicles. The ordinance is
attacked as void because prohibitive and unreasonable.

Without going into unnecessary detail it is sufficient to say
that numerous regulations are laid down for the control of the
vehicles in question, and a license of $25 to $35 is required
according to their capacity. Section 4, however, requires that

before the owners of such vehicles shall be permitted to solicit or receive passengers on or along the paved portions of certain designated streets they shall pay an additional license of $300 to $400, according to the capacity of the vehicle. It is asserted and we are convinced that as to these specifically designated places the requirement is and doubtless was intended to be practically prohibitive. We find no other feature of the ordinance about which serious question could arise as to reasonableness, and it is convincingly apparent that regardless of this requirement of section 4 the ordinance would have been enacted and would be valid. So the validity of this one provision is the sole question for determination.

It is not only suggested and to some extent proved, as shown by the record, but it is well known that the street-car system in the city of Wichita is one long established, that the company is required to pay taxes, to keep up and maintain its tracks and to submit to such reasonable regulations as may be prescribed for its operation. Its maintenance and continuance involve not only the investment and profit or loss upon a large sum of money but to a great extent the convenience and necessity of the city and its inhabitants. Jitneys and similar vehicles run not upon tracks laid at their owners' expense but upon the public streets, with no burden of providing depots or waiting stations, or outlay except the mere cost of vehicles and their operation. No doubt persons thus operating these conveyances for hire must be classed as and are common carriers. Being such they are of legal necessity subject to regulation and control as are other common carriers of passengers for hire.

The presumption of good intention must be accorded the city in passing the ordinance. The same rules of construction apply as to a statute, and unless clearly void the enactment must be upheld. (*Swift v. City of Topeka,* 43 Kan. 671, 23 Pac. 1075; *Denning v. Yount,* 9 Kan. App. 708.)

That the effect of section 4 is incidentally or necessarily to benefit the street railway company is not the last word to be said. It is of interest quite vital to the municipality that a street-car system not only exist there but that it be able to subsist and furnish proper and needed service. It is not a misuse of power so to legislate that this result can be accomplished, merely because it involves an advantage to the utility in question as well as to the municipality.

There is no attempt to exclude from all the streets. On the contrary, all streets and parts thereof except those thus specially reserved are expressly permitted to be traversed at will.

The constitution vests in the legislature authority to make provision by general law for the organization of cities, towns and villages. (Art. 12, § 5.) This has been held to add nothing to the general grant of legislative power expressed in section 1 of article 2. (*Wulf v. Kansas City,* 77 Kan. 358, 94 Pac. 207.) The legislature may rightfully prescribe the powers of a city "subject only to constitutional restrictions." (*Roby v. Drainage District,* 77 Kan. 754, 759, 95 Pac. 399.) It can act directly or through some other body. (*The State v. Railway Co.,* 81 Kan. 430, 105 Pac. 704; *The State, ex rel., v. City of Hutchinson,* 93 Kan. 405, 410, 144 Pac. 241.) In pursuance of this power the legislature has conferred on cities authority to do a variety of things.

"To . . . do all other acts in relation to the . . . concerns of the city necessary to the exercise of its corporate or administrative powers." (Gen. Stat. 1909, § 1214, subdiv. 4.)

To adopt all necessary measures for the protection of the traveling public. (§ 1254.) To fix the rate of carriage of persons. (§ 1255.) To vacate and close any street or alley or portion thereof. (§ 1286.) To require the construction of viaducts or tunnels over and under streets or tracks. (§ 1289.) To levy and collect a license tax upon and regulate all occupations conducted in the city, "including . . . hackney or livery carriages . . . and all wagons and other vehicles transporting . . . passengers for pay." (§ 998. See, also, § 1334.) To issue bonds for the purpose of purchasing, constructing or extending utilities, including a street railway. (Laws 1913, ch. 123; Senate J. R. No. 15, Laws 1913, p. 199.) To construct viaducts and assess the cost to a street railway company. (Laws 1913, ch. 106.) To acquire title by purchase, gift or condemnation of lands for public feed lots and to have supervision and control thereover. (Laws 1915, ch. 127.) In *Kansas City v. Overton,* 68 Kan. 560, 75 Pac. 549, an ordinance was upheld requiring hucksters or hawkers to pay a license of $35 a month and a helper or assistant to pay a license of $15, and exempting from its operation those who personally sold

the produce of their own or leased lands. In *Schaake v. Dolley,* 85 Kan. 598, 118 Pac. 80, upholding the validity of the statute authorizing the charter board to refuse a bank charter where it deems that no public necessity therefor exists, it was pointed out that the alleged common-law right to engage in the banking business must be governed by the wants and conditions of the people, and that it is one of the functions of the legislature to provide such new rules subversive of the common law as it may deem proper for the welfare of society in the changing conditions incident to progress. It was said that to decide the act in question void would be merely to substitute the court's opinion for that of the deliberate judgment of the legislature; further, that the act does not prohibit persons from engaging in the banking business but from needlessly duplicating an established business regardless of the public necessity. The same doctrine applies here. Modern requirements for municipal transportation render it essential that the power to regulate by the governing body be broad. In *Telephone Co. v Telephone Association,* 94 Kan. 159, 146 Pac. 324, involving the establishment of a competitive telephone service in a field already occupied, it was suggested in the opinion (p. 165), that a mere rival can have no such interest as will permit it to maintain an action to prevent competition; that such matters are to be controlled by those acting for the public, in that case the Public Utilities Commission, the statute having provided as a matter of public policy that a telephone company, unless a mutual one, will not be authorized to do business until it has obtained a certificate or a license of authority "as a public convenience and necessity within the community where it seeks to do business." (p. 166.) More closely analogous, perhaps, is *O'Neal v. Harrison,* 96 Kan. 339, 150 Pac. 551, to the effect that under a statute giving power to make regulations to secure the general health, to prevent and remove · nuisances and to compel and regulate the removal of garbage beyond the corporate limits, a city may grant an exclusive right to the highest bidder to remove all the garbage. It was vigorously contended that citizens have a natural or inherent right to remove the garbage from their own premises if they so desire and that discrimination and favoritism were not in contemplation when the power referred to was vested in the

municipality. But the court declared that, "The decided weight of authority supports the right of a municipality either itself to take over the conduct of a business, the manner of operating which may affect the public welfare, or to put it entirely in the hands of a single individual or company." (p. 340.)   It was also said (p. 342) that while monopolies are against public policy this is a rule of the common law not binding upon the legislature.

Underlying all this authority is the substratum of reasonableness, for arbitrary, unreasonable or capricious enactments are not a use but an abuse of legislative power.   Nevertheless, those who pass ordinances for a city, like those who enact statutes for a state, are primarily the judges of what reasonable requirements are, and it is not for the courts to interfere unless and until it appears beyond question that the thing done was not a use but a misuse of power.

"Before, however, courts will interfere and declare a license tax to be unjust or unreasonable, a flagrant case of excessive and oppressive abuse of power by the city authorities in the levying of the license tax must be established." (*City of Lyons v. Cooper*, 39 Kan. 324, syl. ¶ 1, 18 Pac. 296.)

(See, also *Lebanon v. Zanditon*, 75 Kan. 273, 275, 89 Pac. 10; *Stark v. Geiser*, 90 Kan. 504, 506, 135 Pac. 666.)

Whatever natural right a citizen may have to traverse the streets of his city with a motor vehicle for the conveyance of his family or his friends, no inherent right exists to devote his vehicle to the public use of carrying passengers for hire and to appropriate to himself the use of all the streets for purposes of profit.

Beyond question, the city could vacate one or more of the streets over which he might desire to operate.   It can not only require him to pay a license tax but it may also regulate the manner of his carrying on his enterprise.   Why may it not classify motor vehicles by themselves and refuse to permit them to crowd congested portions of the business streets where patrons of another class of vehicles—street cars—must alight and take passage?  Suppose, indeed, a company or corporation owning motor vehicles had the facilities and the desire to occupy all the streets to the utter destruction of the street-car business.  Would the city have nothing to say?  Is the municipality a mere automaton, helpless in the presence of crowding

and conflicting enterprises and scrambles for business which involve the comfort, the convenience and the safety of the traveling public? Not so.

The power to regulate livery and sales stables has been held to include the right to designate their location and to prohibit their erection at other places. (*City of St. Louis v. Russell*, 116 Mo. 248, 22 S. W. 470, 20 L. R. A. 721.) In licensing the use of vehicles on streets it has been held that the city is exercising its police and not its taxing power. (*Tomlinson v. City of Indianapolis*, 144 Ind. 142, 43 N. E. 9, 36 L. R. A. 413, and Note as to authority of municipalities.) It was held by the Texas court of criminal appeals in *Ex Parte Savage*, 63 Tex. Crim. Rep. 285, 141 S. W. 244, Ann. Cas. 1913 D, 951, that an ordinance providing for an official bill poster who shall have the sole power to post bills and advertisements does not violate the Texas statute against monopolies. While denying the validity of the particular ordinance in question for other reasons, it was declared that the city might regulate the erection and maintenance of billboards and prevent the maintenance of others, except as authorized substantially by the ordinance, and require persons before pursuing such business to procure proper license therefor. In *McFall v. City of St. Louis*, 232 Mo. 716, 135 S. W. 51, 33 L. R. A., n. s., 471, an ordinance was upheld which licensed hack drivers who could procure the consent of abutting property owners and denied the same privilege to those who could not obtain such consent. As to the power of the city to establish exclusive hackstands, see Note, 33 L. R. A., n. s., 471. Many exclusive franchises are held not be unlawful although creating legal monopolies. (27 Cyc. 896.) In the case of *In re William Hoffert*, 34 S. Dak. 271, 148 N. W. 20, 52 L. R. A., n. s., 949, the statute under consideration imposed a registration fee of six dollars on all motor vehicles used upon the public highways of the state, twelve and a half per cent thereof to be forwarded to the secretary of state, the remainder to be placed in the county motor vehicle road fund and expended only for the repair and maintenance of public highways beyond the limits of cities and towns. The power of the legislature to impose this license in addition to an *ad valorem* tax was upheld. The road tax of eighty-seven and a half per cent was held to be a proper charge for the privilege of using such vehicles upon the pubic high-

way. Also, that the placing of self-driven vehicles in a class by themselves is not an unlawful discrimination.   The footnote (p. 949) has numerous recent decisions touching the control and classification of motor vehicles upon public highways.   The city of San Antonio passed an ordinance regulating the operation of street cars, jitneys, motor omnibuses and other vehicles using its streets for local street transportation.   The court exhaustively discussed the power of cities to control such transportation.   It seems that the particular provision complained of was one requiring a bond for the protection of citizens, and in an opinion denying a rehearing it was said:

"Appellant desired to use the streets for private purposes of gain, and the city has the absolute right to prohibit the use of the streets for his private business, and in case it gave permission for such use had the right to compel the payment of a license fee." (*Greene v. City of San Antonio*, [Tex. Civ. App. 1915] 178 S. W. 6, 11.)

Certified copies of opinions of the supreme court of Tennessee in *Memphis St. Ry. Co. v. Rapid Transit Co.*, 179 S. W. 635, and *City of Memphis v. State*, 179 S. W. 631, have been furnished.   These decisions, recently rendered, validate the statute of Tennessee declaring those operating jitneys to be common carriers and that their operation should be unlawful within incorporated cities or towns without first obtaining a permanent license under ordinances from such city or town, and that no such license should be issued unless the owner should file with the clerk of the county court a bond of not less than $5000 to cover loss of life or injury to person or property inflicted by such carrier or caused by his negligence, and that such license should embody such rights, terms and conditions as the city or town might elect to impose.   Complaint was made because the city of Memphis had passed no ordinance pursuant to this statute, but the court said it was very clear then that the defendant had no right whatever to do business on the streets of Memphis.   In the first of the cases mentioned it was held that the street railway company could enjoin jitney owners from operating upon the streets without license. In the other the city prosecuted for violation of the statute and the defendant sought release by writ of habeas corpus.   The same conclusion was reached as to the validity of the enactment, and the opinion contains a thorough discussion of the recent development of jitney transportation and the propriety of separate classification.   In *Ex Parte Dickey*, (W. Va. 1915)

85 S. E. 781, the city of Huntington through its commissioners passed an ordinance for the regulation and licensing of "jitney busses," the licenses being graded somewhat on the capacity of the vehicles, requiring a bond of $5000 to pay all lawful claims for damages, the commission reserving to itself the right to refuse or grant such license as applied for or to change the route or hours set forth in the application and then granting the license upon such changed route or hours or both. It was held that one who makes the highway his place of business and uses the streets for his private gain in running a stage coach or omnibus may be utterly denied such right or that it may be permitted to some and denied to others. In the opinion it was said:

"Conveyances on the streets, for the use of the general public, are of the same character, and, in addition to this, cabs, hackney coaches, omnibuses, taxicabs, and hacks, when unnecessarily numerous interfere with ordinary traffic and travel and obstruct them. Prescription of routes or places of business for them is a fair, reasonable, and efficacious means of preventing such results. . . . They are engaged in a public service which the legislature may always regulate." (p. 785.)

The foregoing serve to demonstrate the principle which must control.

In view of all the facts and circumstances it would be difficult to find an expression more apt than the following from the decision in the case of In re Martin, 62 Kan. 638, 64 Pac. 43:

"There is unquestioned power in the legislature to impose a license tax on occupations, whether it be laid for regulation or purposes of revenue. . . . Being a license tax, the express constitutional restrictions as to equality and uniformity of rate do not apply, and the amount of the tax, as well as the method of imposing it, is left to legislative judgment and discretion. . . . If the license tax imposed were flagrantly unreasonable, unjust, and oppressive, courts might properly interfere; but we have no such case before us." (p. 640.)

The trial court denied the injunction sought by the plaintiffs. The requirement of section 4 is within the power of the municipality and the judgment is affirmed.

PORTER, J. (dissenting): Believing that the judgment in this case is wrong, I am compelled to dissent; and because the decision is far-reaching in its results and of more than ordinary importance to the public, I feel it my duty to state the grounds upon which I dissent.

Most that is said in the majority opinion respecting the

power of the city to regulate the operation of jitneys and their use of the streets and to impose a reasonable occupation tax is, I think, beside the mark. This is obvious from the fact that no contention to the contrary is made by the plaintiffs. In their briefs plaintiffs concede that the city may even forbid the operation of jitneys upon certain streets in case the safety of the public requires it. Moreover, at the oral presentation, counsel for the street railway company, who argued the case for the city, frankly stated their contention to be that the city possessed the power to enact the ordinance for the express purpose of preventing competition in the business of the street railway, if such competition would, in the opinion of the city commissioners, result in the destruction of its business or deprive it of sufficient revenue to enable it to furnish adequate service to the public. Although the majority opinion starts out with the concession that section 4 of the ordinance was enacted for the purpose of prohibiting jitneys from operating on certain streets in the city, decisions are cited to the effect that the presumption is that the city acted with a good intent. Since the intent is known and conceded on all sides to have been to prevent jitneys from competing with the street railway, we do not need the aid of any presumption as to its character.

The sole question we have to determine is this: Has the city the power to enact an ordinance forbidding jitneys to operate upon any street occupied by the tracks of a street railway? It is even narrower than I have stated it. The real question is, Has the city the power to enact such an ordinance for the sole purpose of preventing competition in the business of the street railway? If it has, then it follows that the city may prohibit the owners of hacks, omnibuses, taxicabs, and carriages of any kind from using any street to transport persons from one part of the city to another for hire on the ground that the best interests of the city are subserved by giving to the street railway company an exclusive right to transport passengers.

The majority opinion cites authorities to the effect that many exclusive franchises are held not to be unlawful though creating monoplies. None of the authorities cited goes so far as to intimate that a city under the guise of attempting to regulate one business could add anything to the rights and

privileges of another business which a utility corporation carries on under an existing franchise. The city of Wichita is under the commission form of government and the statute governing such cities prohibits the amendment of any existing grant, right, privilege or franchise except by an ordinance, which under certain conditions must be submitted to the electors of the city. (Gen. Stat. 1909, § 1330.) Moreover, it must be obvious that even where a city grants an exclusive right to a street railway, it could not, if it would, give to the company the exclusive right to the use of the entire streets nor forbid the public to use the portion of the streets not occupied by the railway. Suppose a company carrying on the transfer business in a city should complain that its investment was being ruined by competition of private persons who used motor cars and offered the public quicker service at cheaper prices. Could the city under the guise of "regulation," but solely to protect the business of the corporation, enact an ordinance prohibiting the individuals from using the portions of the streets adjacent to railway stations to solicit business? Would the fact that the corporation was operating under a franchise giving it special privileges and requiring it to pay to the city a share of its receipts make any difference? These questions are easily answered when it is remembered for what purpose the streets and highways are established.

The question is asked in the majority opinion, "Why may it [the city] not classify motor vehicles by themselves and refuse to permit them to crowd congested portions of the streets where patrons of another class of vehicles—street cars —must alight and take passage?" (*Ante,* p. 824.) The difficulty is that that is not the question. Plaintiffs who sought to enjoin the enforcement of the ordinance frankly concede the power of the city to regulate the business and to classify motor-driven vehicles by themselves. The question whether the city has the power to enact reasonable provisions designed to prevent the crowding of congested portions of the business streets is not involved, directly or indirectly, in the case.

There is no analogy applicable to this case which can be drawn from the principle decided in *Schaake v. Dolley,* 85 Kan. 598, 118 Pac. 80. There the court upheld the power of the state bank commissioner to refuse a charter for a new bank in a community where in his judgment the banks already

in existence were amply able to care for all the business. The streets of a city are highways for the use of all the public. The city can not, except for the purpose of reasonable regulation, prohibit the public from the use of the streets. While it may by ordinance prohibit heavy traffic on particular streets, its ordinance must be reasonable; and where an ordinance, otherwise reasonable in this respect, denies to an abutting lot owner reasonable access to his property it has been held void. (*Brown v. City of Abilene,* 93 Kan. 737, 145 Pac. 561.) In the opinion Mr. Chief Justice Johnston said: "The streets are provided for the public in general for purposes of travel and transportation" (p. 739), and cited the case of *Bogue v. Bennett,* 156 Ind. 478, 60 N. E. 143, 83 Am. St. Rep. 212, holding void a city ordinance which prohibited traction engines and vehicles not propelled by animal power from using the streets. The Indiana court used this language:

"But vehicles, whether moved by animal, steam, or other power, which do not require a specially constructed track, may be run upon the streets and alleys of a municipal corporation, without first obtaining the consent of the governing body thereof." (p. 486.)

Another question asked in the majority opinion is this: "Would the city have nothing to say" if "a company or corporation owning motor vehicles had the facilities and the desire to occupy all the streets to the utter destruction of the street-car business?" (*Ante,* p. 824.) The obvious answer is, nothing whatever beyond the right to provide reasonable regulations of the new business. The city has not been made in any sense the guardian of the interests of the owners and stockholders of the street railway company, nor charged with the duty of protecting the company from competition, even though new and improved methods of transporting passengers in cities may, and possibly will in the near future, result in "the utter destruction" of the business of street railways. In the language of Judge Cooley:

"When the highway is not restricted in its dedication to some particular mode of use, it is open to all suitable methods; and it cannot be assumed that these will be the same from age to age, or that new means of making the way useful must be excluded merely because their introduction may tend to the inconvenience or even to the injury of those who continue to use the road after the same manner as formerly. A highway established for the general benefit of passage and traffic must admit of new methods of use whenever it is found that the general

benefit requires them; and if the law should preclude the adaptation of the use to the new methods, it would defeat, in greater or less degree, the purpose for which highways are established." (*Macomber v. Nichols*, 34 Mich. 212, 217.)

Twenty-five years ago, when electricity was first demonstrated to be practical and economical for operating street cars, millions had been already invested in cable-car systems, with miles of expensive tunnels in the center of the streets. Competing companies on near-by streets installed trolley lines. No one supposed it was the duty of the municipalities to place obstacles in the way of the public getting immediate benefit of the new and improved method of transportation, although the competition resulted in sending most of the machinery of the cable companies to the junk pile.

To quote again from Judge Cooley:

"Improved methods of locomotion are perfectly admissible, if any shall be discovered, and they cannot be excluded from the existing public roads, provided their use is consistent with the present methods. A highway is a public way for the use of the public in general, for passage and traffic without distinction, (*Starr v. Camden and Atlantic Railroad Company*, 24 N. J. Law, 592.) The restrictions upon its use are only such as are calculated to secure to the general public the largest practicable benefit from the enjoyment of the easement, and the inconveniences must be submitted to when they are only such as are incident to a reasonable use under *impartial regulations*." (*Macomber v. Nichols*, supra, 216.) (Italics ours.)

It is said that in 1845, after the introduction of steam to transportation and machinery, a clerk in the patent office asked to be transferred to some other department because the field of discovery and invention had been exhausted. The other day Edison, speaking of electrical inventions, said: "The surface of things has only been scratched over," and he predicted wonderful developments in the uses of electricity within the next ten years.

On the 29th of last month the supreme court of Louisiana, in the case of *City of New Orleans v. LeBlanc*, — South. —; held an ordinance purporting to regulate the jitney business void for the reason that its provisions were found to be arbitrary and prohibitive. In the opinion it was said:

"The jitneys are automobiles and therefore are entitled to use the streets as matter of right, but they are automobiles used in a peculiar way, which sets them apart in a class by themselves—a fact well recognized the country over. And if, owing to this special use, special regulation is necessary for the safety and convenience of the other users of the street, such special regulation is justified, and the question of

what it shall consist of, is a matter within the discretion of the municipal authorities, with which the courts have no right to interfere in the absence of clear abuse. *Prohibition, however, is not regulation, and if under the guise of a regulation, a measure be in fact a prohibition, it transcends the municipal power.*" (Italics ours.)

Most of the cases cited in the briefs of defendants go no further than to hold that a city may pass ordinances regulating the jitney business. Many of them expressly deny the power to prohibit the business altogether. I do not cite them, since they are not the decisions of courts of last resort. The recent decision of the supreme court of Tennessee, referred to in the majority opinion, in no manner involves the question whether a city under its general grant of power over streets, or in the exercise of its police power, or under what is termed a general welfare clause, may enact an ordinance prohibiting jitneys from using the public streets. That decision is based solely upon a recent statute enacted by the legislature requiring jitneys, before being permitted to operate on the streets of any city, to furnish surety company bonds in the sum of $5000 to indemnify persons who might be injured by the operation of the jitneys.

The court should take judicial notice of the fact that the operation of jitneys, though of very recent origin, is by no means confined to the cities. On the contrary, in the more densely populated places of the country jitneys are operated between cities and in rural districts. If a city, solely in the interest of a street railway company, may prohibit jitneys from using the streets to compete with the business of the company, I can see no reason why the legislature, if it see fit, may not protect the capital invested in interurban trolley lines, and, solely for that purpose, prohibit jitneys from using the public highways to carry passengers from town to town. That the legislature has not authorized a city to do this is sufficient reason why the recent Tennessee decision should not be followed; and until the cold day comes when the legislature of Kansas passes an act attempting to protect investment in street railways by giving them the exclusive right to carry passengers on public highways or authorizing cities to give them such a monopoly of the streets, I think the courts should declare such an ordinance unreasonable, oppressive, and therefore void.

I am authorized to say that Mr. Chief Justice JOHNSTON concurs in this dissent.