Atcheson, J.,
concurring: In July 1859, delegates gathered to draft a constitution that would govern the Kansas Territory upon its recognition as a state. The 35 Republicans and 17 Democrats labored under the watchful eyes of a nation then riven by fierce debate over what we now know as undebatable—the illegitimacy of slavery and tire role of government in denying an inherent right of self-determination to an entire race. That nation, too, had begun to brace for a cataclysmic resolution of the debate that optimistically might be confined to an extraordinary political upheaval but realistically could extract a far worse price paid in blood.
In that unparalleled time, the new Republican Party and its prominent exponents, among them a lawyer from Illinois named Abraham Lincoln, aligned with the abolitionist cause. They had taken up words from the Declaration of Independence as a rallying cry: “[A]ll men are created equal. . . endowed by their Creator *296 with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.” The delegates to the Wyandotte Convention deliberately drew from those words to fashion the first section of the Kansas Constitutions Bill of Rights: “All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness.” Today, more than 150 years removed from that time and place, we have had thrust upon us the task of applying § 1 of the Kansas Constitution Bill of Rights in a modern world to another aspect of self-determination more particularly associated with gender. It is not a task I would have sought out. Nor is it one for which we have much in the way of incisive guidance from our judicial predecessors.
To meet that task, we must first examine the circumstances prompting the delegates to turn to the language of the Declaration of Independence to define a constitutional right. And from those circumstances, we then have to discern how best to apply that constitutional right in a different time. As I outline, for Republicans advancing toward the inevitable final battle over slavery, the passage from the Declaration of Independence expressed not only a present intent to resist tire spread of slavery whenever and wherever possible but also a fervent hope that in future times tire constellation of rights there identified would be extended and deepened in a society respecting the essential freedom and liberty of each person and all peoples. That same aspirational spirit infused § 1 of the Kansas Constitution Bill of Rights.
True to that intent and hope, I must conclude the words of § 1— words that remain unchanged from the day they were adopted— continue to define a right of self-determination. And today in a society recognizing women as full and equal participants in both the benefits and burdens of that society, self-determination necessarily precludes the government from dictating fundamental decisions regarding reproduction and severely fences governmental intrusion otherwise aimed at influencing those decisions or impeding their implementation. Just as the State could not constitutionally compel a woman to terminate a pregnancy, it cannot prohibit her from doing so, subject only to carefully limited regulation necessary to serve essential governmental interests.
*297 In turn, based on the limited record assembled in the early stages of this litigation, I agree the Shawnee County District Court correctly found Plaintiffs Herbert C. Hodes and Tracy Lynn Nauser, medical doctors who perform abortions as part of their practice, have likely shown Senate Bill 95, codified as K.S.A. 2015 Supp. 65-6741 et seq., violates § 1. See L. 2015, ch. 22. The record indicates Senate Bill 95 would complicate most second trimester abortions without advancing any genuine State interest. The district court, therefore, properly issued a temporary injunction halting its implementation.
The district court and my colleagues who would affirm the district court have concluded that § 1 and § 2 of the Kansas Constitution Bill of Rights effectively duplicate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, so they apply federal law governing abortion as Kansas constitutional law. I believe § 1 provides an entirely separate constitutional protection without direct federal counterpart. Because in my view § 1 alone supports the district courts ruling, albeit based on a different constitutional analysis, I consider § 2 only in passing.
I set out the basis for my conclusion in four parts. In the first section, I outline the historical context in which the drafters of the Kansas Constitution included § 1 in the Bill of Rights. Next, I discuss the protections in § 1 prohibiting undue government interference with those inalienable rights, including reproductive freedom, that compose self-determination. Third, I consider both the arguments the State has advanced against such protections and my colleagues’ assessment that § 1 imports federal constitutional law to serve as state constitutional law. In the last part, I explain why Senate Bill 95 likely violates § 1, warranting injunctive relief during the pendency of this case.
I
In less than 300 words spoken in a Pennsylvania hamlet on November 19, 1863, Abraham Lincoln cast an American creed that generally has come to be accepted as representing the noble best of this nation. Lincoln wove together intent and hope as *298 he defined the proposition upon which this country was founded as the inherent right of all men to equality and alluded to the unfinished work in advancing that cause. He then paid tribute to the ultimate sacrifice of the Union soldiers who perished there 4 months earlier in the battle of Gettysburg. In doing so, Lincoln traced the expression of this nation’s essence to the Declaration of Independence. The indelible opening to the Gettysburg Address left no doubt as to the source of Lincolns vision of that ideal—87 years measured from the creation of the Declaration of Independence. He looked to the same words the drafters of the Kansas Constitution placed in its Bill of Rights.
The intersection of Lincoln, the Declaration of Independence, and the Kansas Constitution is no accident of history. That intersection, amidst the bitter fight over slavery, imparts meaning to the Kansas Constitution and, in particular, § 1 of the Bill of Rights.
During the years the Kansas Territory struggled to secure entry into the Union as a free state, Lincoln often spoke publicly of the Declaration of Independence as the polestar in defining American idealism—most prominently, perhaps, in his own campaign for the United States Senate just months before his fellow Republicans led the way in drafting the Kansas Constitution at the Wyandotte Convention. The fate of Bleeding Kansas riveted a nation consumed by the intensifying storm of free colliding with slave and the underlying moral imperative of how tire dispossessed and the disenfranchised ought to be treated in a fair society. On the eve of the constitutional convention, Kansas Republicans met as a party to adopt resolutions outlining their vision for a free and fair society. Their vision expressly saw in the Declaration of Independence recognition of fundamental rights extended to people “of all countries and all times.”
As events in Kansas shaped national politics and debate, the reverse was also true. So historical context bears directly on what the drafters of the Wyandotte Constitution sought to achieve and how we should consider the result of their work a century and a half later.
The Kansas Territory undertook steps for admission to the Union in 1855, as free-state proponents repudiated the proslavery *299 territorial legislature as illegitimate and gathered to draft the Topeka Constitution. Kansas statehood stalled in Congress, where Illinois Senator Stephen A. Douglas, a nationally prominent Democrat, helped orchestrate the opposition. In the meantime, proslav-ery forces came across the border from Missouri. Some of those “border ruffians” meddled in Kansas politics, leading to continual assertions of fraudulent territorial elections. Others chose more violent confrontations with their free-state counterparts, guerrilla skirmishing that prompted the “Bleeding Kansas” nickname.
In July 1856, the Republican Party held its first national convention in anticipation of the presidential election that fall. The party platform expressly invoked the Declaration of Independence and included a resolution that “the inalienable right to life, liberty, and the pursuit of happiness” should be “secure[d] ... to all persons” and slavery should not be allowed in any territories. Much of the balance of the platform consisted of a remonstrance that “the dearest Constitutional rights of the people of Kansas have been fraudulently and violently taken from them” and a call for the immediate admission of the Kansas Territory as a free state. In the national election, Republican presidential candidate John Fremont carried 11 free states but lost to Democrat James Buchanan.
A year later, the proslavery Kansas territorial legislature authorized another constitutional convention. The delegates drafted the Lecompton Constitution explicitly permitting slavery as an exercise of an “inviolable” right to property “higher than any constitutional sanction.” Continuing the byzantine political maneuverings that had come to be territorial politics, Kansans went to the polls during the convention and elected a free-state legislature. In December 1857, the Lecompton Constitution was then approved in a special election that most free-state proponents boycotted. In the meantime, the new legislature was called into special session and scheduled a second vote for January 1858, resulting in a sound rejection of the Lecompton Constitution.
Nonetheless, President Buchanan requested that Congress admit the Kansas Territory as a slave state under the Lecompton Constitution. That was too much for many northern Democrats who joined with Republican congressional members to derail *300 Buchanan’s proposal. The resulting compromise led to yet a third vote on the Lecompton Constitution in August 1858. It was voted down by more than 5 to 1.
On March 6,1857, the United States Supreme Court ruled that Dred Scott, a slave, lacked standing to sue in federal court for the freedom of his family after they had been taken by their owner to several states and territories that outlawed slavery. Scott v. Sandford, 60 U.S. 393, 15 L. Ed. 691 (1856). The Court held that people forcibly brought to this country as slaves and their descendants were of an “inferior class of beings” and, therefore, could not be considered to have the legal capacity to sue in federal court. 60 U.S. at 404-05, 426-27. So, the Court said, Scott’s suit should have been dismissed for want of jurisdiction. The Court went on to find slaves to be property and, thus, similarly incapable of bringing suit. 60 U.S. at 453. In arriving at those conclusions—rightfully considered perhaps the most judicially and morally reprehensible ever issued by the Court—Chief Justice Roger B. Taney took the opportunity to offer his assessment of the Declaration of Independence as a document describing rights belonging to the white race and to suggest any other purpose too farfetched to be fairly entertained. 60 U.S. at 410 (“The unhappy black race ... were never thought of or spoken of except as property, and when the claims of the owner or the profit of tire trader were supposed to need protection.”). The decision ratcheted up the national debate over slavery and fueled the division between Republicans and Democrats and their free-state and proslavery backers.
In mid-June 1857, Senator Douglas gave a speech in the Illinois statehouse embracing Chief Justice Taney’s view of the Declaration of Independence as he commented on the Scott decision and other issues of the day. He rhetorically suggested “any sane man” must believe the authors of the Declaration spoke only of the white race. Indeed, Senator Douglas offered that the rights described in the Declaration were intended only for the British subjects residing in the colonies. Lincoln was invited to give a speech there and did so about 2 weeks later. The forum and the competing addresses bore *301 significant political implications, since Lincoln had emerged as a likely challenger to Senator Douglas.[1]
In what became known as the Dred Scott speech, Lincoln placed an entirely different meaning on the invocation of inalienable rights in the Declaration of Independence. Responding directly to Senator Douglas’ cramped interpretation, he stated: “I had thought the Declaration contemplated the progressive improvement in the condition of all men everywhere.” As an example, Lincoln offered the image of a slave woman who “in her natural right to eat the bread she earns with her own hands without asking leave of anyone else ... is my equal, and the equal of all others.”
Lincoln undertook an extended disquisition on the significance of including inalienable rights in the Declaration of Independence and the authors’ conception of those rights as being fully realized not in their own time but in some more progressive era. In part, Lincoln said of Thomas Jefferson and the others who helped write die Declaration:
“They defined with tolerable distinctness, in what respects they did consider all men created equal in ‘certain inalienable rights, among which are life, liberty, and the pursuit of happiness.’ This they said, and this meant. They did not mean to assert the obvious untruth, that all were then actually enjoying that equality, nor yet, that they were about to confer it immediately upon them. In fact they had no power to confer such a boon. They meant simply to declare the right, so that the enforcement of it might follow as fast as circumstances should permit. They meant to set up a standard maxim for free society, which should be familiar to all, and revered by all constantly looked to, constantly labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence, and augmenting tire happiness and value of life to all people of all colors everywhere.”
Barely a year later, the Republican Party nominated Lincoln to oppose Senator Douglas in his bid for reelection. The pair agreed to seven joint campaign appearances across Illinois that would form the historic Lincoln-Douglas debates, though in format they really were uninterrupted addresses in which one man spoke first and last *302 with the other speaking in between. The campaign and the debates drew national attention in part because of Senator Douglas’ political stature and in part because the issues drew heavily upon slaveiy, the status of the Kansas Territory and die darkening specter of the Union metaphorically if not actually split in two. In that cauldron, Lincoln and Douglas again advanced their conflicting views of the Declaration of Independence.
At the fifth debate in Galesburg on October 7, 1858, Senator Douglas opened by discussing the Kansas-Nebraska Act and offering an extended explanation of his position on the Lecompton Constitution and the circumstances under which the Kansas Territory might be admitted as a state. After accusing Lincoln and the Republicans of waffling on the rights to be extended “the negro” in the Declaration of Independence, Senator Douglas affirmed that the founders intended to establish a government “made by white men for the benefit of white men and their posterity forever, and was intended to be administered by white men in all time to come.” Early in his reply, Lincoln briefly dismissed Douglas’ characterization of the Declaration of Independence as lacking any historical support.
But Lincoln returned to the topic in the remaining debates. Six days later in Quincy, Lincoln repeated that all people without regard to color were embraced within the Declaration of Independence and enjoyed “the right of fife, liberty, and tire pursuit of happiness.” And he again alluded to a person’s “right to eat the bread without the leave of anybody else which his own hand earns.” In the final debate in Alton on October 15, Senator Douglas spoke extensively about his unwillingness to support tire Lecompton Constitution and the Democratic Party’s desire that each state and territory decide for itself whether to permit or bar slaveiy He also repeated his view that tire Declaration of Independence was meant to apply only to men of European descent. During his response, Lincoln quoted at length from his Dred Scott speech and noted that those remarks had been printed and widely disseminated. He reiterated that the essential right set forth in the Declaration of Independence carne with both a promise “that tire enforcement of it might follow as fast as circumstances should permit” and an understanding that it would “constantly [be] spreading and deepening its influence ... to all people, of all colors, everywhere.”
*303 Although Republican candidates for the Illinois Legislature captured more popular votes than their Democratic rivals in the election, the Democratic Party retained control of the legislature based on how the districts had been drawn and carry-over incumbents not up for reelection. As a result, the legislature returned Douglas to the Senate in Januaiy 1859. But the campaign—particularly tire debates—vaulted Lincoln to national prominence as a powerful voice of the emergent Republican Party. He, of course, would go on to become the party’s presidential nominee in 1860 and to beat Senator Douglas, the Democratic Party nominee, in a four-way race that included Southern Democratic Party candidate John C. Breckinridge and John Bell of the Constitutional Union Party.
When the Kansas Republican Party held its first political convention in mid-May 1859, the organization extended an invitation to Lincoln to address the proceedings. Although he declined, Lincoln sent a letter written for the occasion urging the party leadership to resist “the temptation to lower the Republican Standard in order to gather recruits,” for doing so “would surrender the object of the Republican organization—the preventing tire Spread and Nationalization of Slavery.” In his stead, Horace Greeley, the publisher of the New York Tribune and an early backer of the national Republican Party, spoke to convention attendees.
Greeley recalled the efforts of Republicans nationally in support of the Kansas Territory’s admission to the Union as a free state in 1856 and referred to “the able and gallant Lincoln of Illinois” as a forceful opponent of allowing slavery to spread to free soil. In keeping with tire occasion, Greeley pointed out that key principles of the Republican Party’s national platform recognized “every innocent man has a right to himself. . . [and] to fair and just recompense for his own labor.” And he scolded the Democratic Party for embracing “the natural, necessary, rightful subjugation of one race to another” contrary to the “fundamental position of Jefferson and the Fathers” expressed in the Declaration of Independence.
At the party convention, Kansas Republicans adopted resolutions that, among other things: (1) acknowledged the Declaration of Independence as containing “self-evident truths” that afford “popular rights for all countries and times;” (2) opposed *304 the expansion of slavery to free states or territories and any importation of Africans as slaves; and (3) called upon the delegates to the Wyandotte Constitutional Convention to include in a bill of rights a provision that neither slavery nor involuntary servitude should ever be permitted in Kansas except as punishment for crimes. Those provisions paralleled the national party’s platform and echoed Lincolns invocation of the Declaration of Independence as a testament to a set of rights inhering in all peoples transcending both forms of government and societal precepts fixed in a particular era.
Six weeks later, the delegates to the Wyandotte Constitutional Convention gathered to do their work.
A fortnight into the convention, the delegates had one of their more protracted discussions over what would become § 1 of the Kansas Constitution Bill of Rights. As originally proposed, the section was notably wordier and borrowed directly from the 1851 Ohio Constitution, which served as a template for much of the Bill of Rights and other parts of the Wyandotte Constitution. The debate included considerable back and forth over how the provision might affect criminal statutes and enforcement of the federal Fugitive Slave Act. A number of amendments were proposed and tabled. At least a couple of them appeared to be pointed jabs from one Republican delegate toward the Democrats, suggesting they wished to deny those rights to persons of African descent.
Toward the end of the debate, Samuel Kingman, a Republican, proposed the language that would become § 1. Kingman described the words as stating an “old truth” drawn from the Declaration of Independence—a document he said “formed part of our political creed, from which no man can extricate himself.” Kingman, however, did not elaborate on the meaning he imputed to that particular truth and simply pronounced the language “broad enough for all to stand upon.” Another delegate suggested tire provision to be imprecise and again touched on the interplay between the Kansas Constitution and federal law. The delegates then approved King-man’s language on a 42 to 6 vote, a tally leaving 4 delegates unaccounted for.
In short order, the delegates adopted § 2 without debate. Likewise, without discussion, they adopted a prohibition of slavery as *305 § 6—a provision that paralleled the state Republican Party’s resolution approved that May.
The delegates completed their mission on July 29,1859, although the Democrats refused to sign the finished document. The Wyan-dotte Constitution was, nonetheless, overwhelmingly approved by popular vote about 2 months later. With Lincolns election as president in November 1860, southern states began seceding to form the Confederacy. Congress, less the members from those states, joined with departing President Buchanan to approve statehood for the Kansas Territoiy. On January 29, 1861, Kansas joined the Union as a free state with the Wyandotte Constitution as its charter. Lincoln took the oath of office as President on March 4. The Civil War began on April 12 when Confederate troops fired on the federal garrison at Fort Sumter, South Carolina. The war ended 4 years later with military dead on both sides of more than 600,000 and an inestimable loss of civilian fife and property. Less than a week after General Robert E. Lees surrender to General Ulysses S. Grant, Lincoln belonged to the ages—the first American President to be assassinated. [2]
II
A century and half removed from that epochal period, we have been asked to construe § 1 and § 2 of the Kansas Constitution Bill of Rights with little in the way of concrete guidance from either the convention debate itself or judicial decisions since. The chasm of time and circumstance between then and now defies any casual description. We must discern from that earlier time *306 and circumstance why the drafters turned to language from the Declaration of Independence, and then we must gather the overarching purpose they imputed to words that had been appropriated in their era as guiding principle in the fight against slavery.
To that end, I put aside § 2 and return to it only briefly, since I do not see in § 2 rights that address the issue before us. But properly understood and applied, § 1 does. So I look there.
The text of § 1 is worth repeating: “All men are possessed of equal and inalienable natural rights, among which are fife, liberty and the pursuit of happiness.” The sentence must be read and understood as expressing a single, complete idea. It shouldn’t be broken into phrases or subparts as if it were a criminal statute outlining elements of an offense or a revenue measure listing taxable commodities. Section 1, rather, offers a profound declaration of a set of rights to be universally embraced across die artificial boundaries of nations and their governments and unburdened by some constricted sense of humanity drawn from a time past. The drafters, thus, constitutionalized a principle transcending institutional forms and temporal limitations to touch something more basic in defining the condition of living as a human being. Moreover, they acted with the hope and, indeed, the understanding that deep into the future, society would be better and fairer in ways they could not foresee, thus clarifying and even enhancing that definition. So the principle they captured in § 1 would be no less profound and no less necessary in that future time, which is to say our time.
The language obviously borrows from the Declaration of Independence, as Delegate Kingman explained. But § 1 takes full meaning from what the words had come to embody in 1859 as an integral statement of principle of the Republican Party, both nationally and in Kansas, and the abolitionist movement. What Jefferson and the others contributing to tire Declaration of Independence might have meant provides historical backdrop. More removed still are the European philosophers, particularly John Locke, whose discourse on natural rights influenced Jefferson. Although slavery divided the colonial revolutionaries and the framers of the United States Constitution, it did so without the urgency of impending disaster. The Kansas Constitution was directly informed by the depth *307 and immediacy of the crisis over slavery and the pronounced preferences of the Republican Party in addressing the crisis. [3]
The language of § 1 has no direct or even generally analogous counterpart in the United States Constitution. The provision, therefore, affords protections distinct from any in the United States Constitution and should be construed independently of federal constitutional law.
By invoking and constitutionalizing natural rights, § 1 brings into the sphere of government a set of principles that exist outside societal and representative organizations. Natural rights derive from an authority or source greater than those organizations and may be thought of as essential for a human being to live in a condition recognizing his or her humanity. Slavery, for example, is anathema to such natural rights. For one person to own another is to deprive the one owned of any semblance of autonomy, an indispensable component of any characterization of natural right reposing in the ability to think deliberately and act on that deliberation. Slaves are chattel of their masters, unable to come and go as they please, associate as they wish, or work in a manner of their choosing while enjoying the product of their labor. They are reduced to things— beasts of burden—toiling neither by their own election nor in their own service.
By natural right, then, one person may not be controlled by another. That is bound up in liberty as the term is used in § 1. Similarly, a person is entitled to his or her property without the interference of another. That is bound up in the pursuit of happiness, although the breadth of the phrase isn’t especially well set. The rights, however, function collectively rather than distinctly to define what may be fairly considered as self-determination or the exercise of free will.
When people join together to form societal or governmental organizations for their mutual benefit, they leave their natural state and, thereby, cede any immediate resort to those natural rights. They substitute some form of democratic decisionmaking designed *308 to advance the good of the community. The bargain supposes that the organization will not decimate those natural rights. The organization, therefore, could not aid and abet slavery, either by facilitating its private institution or engaging directly in it as public policy. As suggested in the Declaration of Independence, should an organization transgress the natural rights of tire members of a recognized group within the organization—“one people” in the words of the Declaration—that group could seek redress and, if rebuffed, “dissolve the political bands” of affiliation with the organization. The disaffiliation then restores the natural state as between the organization and the departing group.
Section 1, however, reconfigures the relationship between natural rights and a governmental entity by making those rights part of the governments charter to be considered and enforced in the same manner as other parts of the charter. In our tripartite forms of government at both the federal and state levels, the judicial branch has been entrusted with the duty to constare the charter, here the Kansas Constitution, and to determine if the executive branch or legislative branch may have overstepped the limits imposed in the charter. More or less, that is the task before us today with respect to Senate Bill 95.
The rights pronounced and protected in § 1 are those constituent in the natural right of self-determination. And in keeping with the intent of the Kansas Republicans of 1859 who drafted and approved § 1, the right of self-determination should be assessed as one for all times. Just as self-determination maybe realized in freedom from bondage and in the concomitant ability to malee choices, both profound and prosaic, it necessarily extends to procreation. Decisions about procreation infuse self-determination and the manner in which a sense of self may be projected forward. Some may choose offspring as their favored medium for projecting themselves into the future. Others may choose good works apart from childbearing and childrearing. But even less contemplative decisions regarding procreation are equally an exercise of self-determination and must be so treated. Self-determination is not reserved for the especially insightful or the deeply philosophical.
*309 Because reproductive freedom is an essential quality of self-determination and, thus, a natural right, § 1 shields that freedom against excessive governmental encroachment. Consistent with § 1, the State cannot compel a woman to bear children. Nor can it compel her to terminate a pregnancy or to be sterilized upon giving birth to a healthy child. But, likewise, the State may not force the opposite choices upon a woman, for that is equally incompatible with the constitutional shield for self-determination. A woman has a right to reproductive freedom that entails deciding whether to continue or terminate a pregnancy. In short, § 1 prevents the State from banning abortion and substantially limits government regulation impeding the exercise of self-determination as expressed in an individuals decisions regarding procreation.
That result is entirely in keeping with the progressive, aspirational quality the Republican Party had advanced for the language of the Declaration of Independence preceding the Civil War. In the hands of the Republican delegates to the Wyandotte Convention, the same quality infused the words of § 1 with the same spirit and hope for a fair society eventually exceeding their expectation or comprehension.
In that time, women were denied much of any role in government and were kept from any semblance of full and equal participation in society generally. They were treated as distinctly less able than men—best suited for domesticity rather than decisionmaking. Most visibly, of course, women could not then vote or hold public office. We now recognize women to be just as capable as men in managing their own affairs and those of government and industry. Although the general societal and legal acceptance of gender equality hasn’t yet reached every quarter, § 1 doesn’t bend to the obdurate views of those who would cling to the days when white men were the acknowledged masters of the realm.
Consistent with the drafters’ overarching vision for § 1, women cannot now be permitted only a half-measure of self-determination. Accordingly, women have a right protected in § 1 to exercise reproductive freedom as an essential component of their self-determination. To suggest otherwise ignores the promise of § 1 as a forward-looking right and denigrates women as human beings lacking the capacity to malee decisions for themselves. The suggestion, in *310 turn, simply inflates a pernicious stereotype that women are flighty creatures in constant need of guidance and protection to be supplied either by menfolk or, in this case, a meddlesome government. That sort of paternalistic claptrap animates the majority opinion in Gonzales v. Carhart, 550 U.S. 124, 159-60, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007), the United States Supreme Court’s most recent pronouncement on federal abortion rights. See also 550 U.S. at 183-86 (Ginsburg, J., dissenting) (dismissing the notion as an “antiabortion shibboleth” that “concededly” lacks supporting evidence). But tire notion has no place in assessing the scope of § 1 in a modern world—a world die drafters of the Kansas Constitution anticipated, even though they understood they could not envision its particular contours. In short, § 1 cannot now be constrained by a definition of a womans right to self-determination dependent upon mid-19th Century social and political conventions.
Constitutional rights, however, are not boundless, and self-determination, as protected in § 1, is no exception. But self-determination is an essential right deserving of the utmost respect. Accordingly, government action—here in the form of a legislative enactment—may not summarily or heedlessly impede that right. Any impairment must be carefully circumscribed to further an essential governmental interest. For example, statutes generally regulating medical procedures, physicians, and other aspects of the healing arts would not run afoul of § 1, especially if they were intended to materially enhance patient safety. Conversely, given the apparently low incidence of'complications associated with widely used surgical and nonsurgical abortion procedures, the State presumably could not single out those procedures or the medical practitioners using them for heightened regulation without some exceptional justification. In Section IV, I discuss how this standard applies to Senate Bill 95 and why Senate Bill 95 appears to contravene § 1.
In at least some iterations, natural rights did not extend to those incapable of exercising them, notably children and the mentally infirm. Those individuals, however, were considered wards of immediate relatives, such as parents, who would act as their guardians. As I have said, § 1 does not consist of unalloyed natural rights, *311 since die very inclusion of them in a constitution transforms them from rules operating in an environment without government to a brake on government. Government entities have long exercised in loco parentis supervision over minors and have facilitated legal guardianships for the incompetent. Nothing in § 1 upsets those governmental functions, so that a parent chronically neglecting or abusing a child could be sanctioned civilly or criminally.
In that context, a viable fetus has a peculiar legal status. A viable fetus is capable of living apart from its mother but isn’t doing so. Yet, the fetus is not counted as a child in many respects. Age is measured from birth, not viability. The same is true for income tax deductions. Nonetheless, the capacity of a viable fetus is such that the State may exercise some degree of stewardship for its welfare. Accordingly, the State may limit a womans exercise of reproductive freedom in terminating a pregnancy after the fetus has reached viability.
Before reaching viability, however, a fetus is, by definition, incapable of independent existence. And the fetus is similarly incapable of free-will or self-determination—attributes necessary to exercising natural rights. In that situation, a woman’s right of self-determination, as established in §1, takes precedence over any inchoate interest of a fetus that is not yet viable. Similarly, governmental interference with a womans decision regarding a pregnancy at that point would effectively reduce an inalienable right to a limited license.
In 2013, the Kansas Legislature enacted K.S.A. 65-6732 reciting as findings that fife begins at conception and that upon fertilization, a human ovum immediately has a protectable interest "in fife, health and well-being.” Based on those findings, the statute requires state law to “be interpreted and construed” to give the zygote as it gestates the legal rights accorded “other persons, citizens and residents of this state.” K.S.A. 65-6732(b). The statute cannot, however, alter the constitutional rights secured in § 1. That’s because the legislature cannot mandate how the courts construe constitutional protections. And K.S.A. 65-6732(b) more or less acknowledges as much by noting its effect is “subject only to” the United States Constitution and tire Kansas Constitution. *312 To suppose otherwise negates the fundamental authority of the judiciary. Gannon v. State, 298 Kan. 1107, 1160-61, 1168, 319 P.3d 1196 (2014); Board of County Com’rs of Leavenworth County v. McGraw Fertilizer Serv., Inc., 261 Kan. 901, 916, 933 P.2d 698 (1997) (“When a question of interpretation of the Kansas Constitution arises, it is the function and duty of this court to define constitutional provisions.”).
As the State has pointed out in this case, the Kansas Constitution may be changed if the legislature chooses to put a proposed amendment to a vote of the people. See Art. 14, § 1, Kansas Constitution. To the extent the legislature believes the protections for self-determination in § 1 may be in need of change, it has tire authority to ask the people to consider taking such a step. The legislature cannot statutorily circumvent the people s prerogative by directing how the judiciary must interpret the constitution. But I read K.S.A. 2014 Supp. 65-6732(b) to include legislative recognition that the courts (properly) should not apply the statute in construing tire Kansas Constitution. Given that recognition, I need not explore potential defects in the statute itself.
Self-determination, of course, is not confined to reproductive freedom. Nor is § 1. This case, however, requires no greater elaboration on the breadth of § 1. The component natural, inalienable rights protected in § 1 are necessarily narrow, since they originate outside the constructs of government and organized society and their exercise must be essential for a person to act as an independent human being. At the same time, a natural right, if exercised, cannot diminish another persons rights. So taking someone’s property isn’t a natural right. By and large, criminal statutes would not, then, run afoul of § 1 certainly insofar as they impose punishments of incarceration for malum in se offenses. Malum prohibitum offenses generally carry comparatively minor punishments that wouldn’t even arguably implicate § 1. The forensic foil of a life sentence for a parking offense, see Rummel v. Estelle, 445 U.S. 263, 274 n.11, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980), presumably would, but it also would undoubtedly violate the ban on cruel or unusual punishment in § 9 of the Kansas Constitution Bill of Rights.
*313 How arguably more targeted provisions of the Kansas Constitution, such as § 9, interact with § 1 isn’t wholly obvious. The lines of division in the Bill of Rights aren’t precise. For example, the prohibition on slavery in § 6 also bars “involuntary servitude, except for the punishment of crime[.]” As a result, the exception in § 6 presumably limits the proscription in § 9. Similarly, slavery violates both § 1 and § 6, so those provisions act in tandem. Section 1, in turn, must reach beyond slavery, as the common understanding of natural rights would suggest and as the aspirational intent of the drafters would require. The provision otherwise would have been redundant and unnecessary. To address the issues at hand, I need not plumb the legal relationship between § 1 and the other protections in the Kansas Constitution Bill of Rights.
I turn briefly to § 2, since Drs. Hodes and Nauser also premise their action on that part of the Kansas Constitution Bill of Rights. Section 2 provides:
“All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency.”
In the first sentence, the drafters expressed the broad idea that governments derive their legitimacy from the consent of the governed. If a government acts contrary to that consent or dismisses such consent as superfluous, it can no longer be characterized as “free” and, presumably, has become tyrannical. I don’t especially see in that statement a specific protection “the people” may enforce through the judicial process so much as an implicit recognition of the pronouncement in the Declaration of Independence that an identifiable constituency has an inherent right to sever connections with a government turned repressive.
But that acknowledgment serves as a prelude to the balance of the sentence that states free governments are to afford “equal protection and benefit” to the people. The second clause easily can be read to secure a right comparable to the Equal Protection Clause of the Fourteenth Amendment, as the Kansas Supreme Court has recognized. See State v. Limon, 280 Kan. 275, 283, 122 P.3d 22 (2005). We do not, however, have an equal protection claim in front *314 of us. The second sentence of § 2 precludes the legislature from authorizing irrevocable “privileges or immunities.” Whatever the limitation imposed by that part of § 2, it has no apparent application here, and none of the parties has argued otherwise.
III
The State contends § 1 contains no enforceable rights and is merely a precatory platitude. But that plainly is incorrect. Had the drafters meant the language of § 1 to be constitutional filigree, they would have put it in the preamble. The Lecompton Constitution, for example, included a statement similar to § 1 in the preamble with no comparable provision within its text. The difference, especially with the importance those words bore for the Republicans, is compelling.
During the Wyandotte Convention debate, the delegates argued whether § 1 could be construed to relieve Kansans of any obligation to enforce the federal Fugitive Slave Act. The discussion would have been wholly unnecessary had the delegates intended § 1 to establish no enforceable constitutional rights. None of the delegates offered that idea as a denouement to the disagreement.
The Kansas Supreme Court has consistently indicated § 1 and § 2 have much the same effect as the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Limon, 280 Kan. at 283; Henry v. Bauder, 213 Kan. 751, 752-53, 518 P.2d 362 (1974). Although those statements do little to fix the precise contours of § 1 and § 2, they cannot be reconciled with an argument that either provision is merely the constitutional counterpart of a zero—a placeholder adding nothing of real value.
The courts decision in Schaake v. Dolley, 85 Kan. 598, 118 P. 80 (1911), has been tossed around as supporting the State s argument. But it doesn’t. Without citing any particular authority, the court recognized § 1 to protect a liberty interest resting in a person s right to engage in “a gainful occupation of his own choosing.” 85 Kan. 598. To me, that sounds more like economic due process than inalienable right and seems to rest on now discarded Lochnerian notions that laborers enjoy the “freedom” to agree to work inhumane hours for depressed wages because oligopolistic employers have *315 the power to impose those conditions. See Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); Lincoln Federal Labor Union, No. 19129 v. Northwestern Iron & Metal Co., 335 U.S. 525, 534-37, 69 S. Ct. 251, 93 L. Ed. 212 (1949) (tracing rise and ultimate rejection of substantive due process right to contract); Lochner v. Neto York, 198 U.S. 45, 53, 25 S. Ct. 539, 49 L. Ed. 937 (1905) (right to contract regarding commerce recognized as liberty interest protected in Fourteenth Amendment from government regulation of terms and conditions of employment). Pertinent here, however, the court found § 1 to be a source of enforceable rights, thus contradicting to the State s argument to us.
The Schaake court went on to say that the right to pursue employment had to yield to reasonable government regulation aimed at promoting the common good, so the plaintiffs had no constitutional right to insist the state agency regulating banking issue them a charter for what would be the fifth bank in Abilene—something the agency determined would exceed marketplace demand and imperil the stability of the banks. In that context, pertaining to economic regulation, the court observed that § 1 “cannot be entirely disregarded” but serves more as a guide to tire legislature to act appropriately in the public interest than as a grant of judicial authority to supplant reasonable legislative action. 85 Kan. at 601. The court’s admonition, however, does not obviously extend beyond the economic interests of the land at issue in the case. Its lengthy discussion fairly well confirms as much,
The Schaake decision also suggests a court could not turn to natural law, as such, to resolve a legal dispute. 85 Kan. at 602. As I have indicated, that is true. But it really has nothing to do with applying § 1. Natural law exists outside the constructs of government. Courts, as creatures of the government, are empowered to construe and apply the rules of the government as expressed in an organic document, legislative enactments, and judicial precedent. They have no license to reach beyond those rules to decide the matters before them. Section 1, however, constitutionalizes a segment of natural law defining self-determination, thereby bringing that set of rights within the rules of government and the body of law the Kansas courts may draw upon in settling legal disputes.
*316 The State also relies heavily on Kansas Territorial statutes in effect at tire time the Wyandotte Constitution was drafted that prohibited abortions except “to preserve the life” of the woman and criminalizing an abortion of a “quick child” as manslaughter and otherwise as a misdemeanor. Kan. Terr. Stat. 1855, ch. 48, § 10; Kan. Terr. Stat. 1855, ch. 48 § 39. Similar statutes remained in effect for over 100 years. In 1969, the Kansas Legislature considerably broadened the health exception, L. 1969, ch. 180, sec. 21-3407, although abortion otherwise remained illegal in Kansas until Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). The State argues that history undercuts any contention the drafters intended § 1 or any other part of the Kansas Constitution to permit abortions.
We may fairly conclude the delegates to the Wyandotte Convention did not consider reproductive freedom or abortion in drafting the Kansas Constitution. But that doesn’t mean the drafters intended § 1 to be a static statement of self-determination. The circumstances strongly indicate otherwise and show the drafters meant to provide a constitutional protection that would grow to take account of maturing societal values they recognized they could not necessarily foresee. As I have already explained, § 1 strove to capture a right with a “spreading and deepening” influence reflecting “the progressive improvement in the condition of all men everywhere,” as Lincoln expressed it, and a right “for all times,” as Kansas Republicans put it just weeks before the Wyandotte Convention. So that history does not trap women with a stunted measure of self-determination today.
I turn next to the reading my colleagues give to § 1 in affirming the district courts temporaiy injunction. They say the Kansas Supreme Court has found in § 1 a constitutional equivalent to the Due Process Clause of the Fourteenth Amendment. So § 1 necessarily includes the unenumerated constitutional rights comprising the substantive due process liberty interests protected in the Fourteenth Amendment. Those interests include, among other things, interlocking lights to be free of undue government intrusion in decisions about contraception and childrearing and a prohibition on involuntaiy sterilization as a penal sanction. Based on *317 those precedents, the United States Supreme Court recognized a substantive due process right to abortion. See Roe, 410 U.S. 113. If § 1 replicates in all respects the Due Process Clause, then it obviously includes the same right to abortion. In effect, as Judge Leben explains, the federal constitutional law of abortion becomes the Kansas constitutional law of abortion.
Assuming the constitutional equivalence of the Due Process Clause of the Fourteenth Amendment and § 1 of the Kansas Constitution Bill of Rights, I would agree with Judge Leben s conclusion that Senate Bill 95 likely contravenes the Kansas Constitution based on the limited record compiled in the district court. I would, therefore, also agree that the district court properly issued a temporary injunction.
Although I ultimately arrive at the same legal conclusion, I question the assumption of equivalence. I have a difficult time seeing in § 1 a due process provision akin to the Fourteenth Amendment, and I don’t believe the drafters intended to adopt such a provision. Rather, as I have explained, § 1 rests on language intentionally taken from the Declaration of Independence that is without a counterpart in the United States Constitution. As such, § 1 provides a constitutional protection that has no direct analog in the federal Constitution. So § 1 should not be construed or applied using federal constitutional law as guide, let alone an exact template. If, however, § 1 does include Fourteenth Amendment due process rights, those rights must be in addition to and not to the exclusion of the “equal and inalienable natural rights” actually described there.
The delegates to the Wyandotte Convention could not have intended to incorporate the Fourteenth Amendment into the Kansas Constitution, since the amendment would not be drafted for another 6 years. But the Fifth Amendment to the United States Constitution bundles together a number of diverse protections, including a Due Process Clause. It, in part, states: “[N]or shall any person ... be deprived of life, liberty, or property, without due process of law.” Although the Fifth Amendment applies to the federal government, its due process provision parallels what would later appear in the Fourteenth Amendment as a check on state action. Clear due *318 process language was no mystery in 1859. Even more immediate for the Wyandotte Convention delegates, die Lecompton Constitution did include a due process clause. Section 9 of the Lecompton Constitution Bill of Rights provided: “[N]o freeman shall be . . . deprived of his life, liberty, or property, but by the judgment of his peers, or the law of the land.”
The Wyandotte Constitution lacked an explicit due process provision like the ones in the Fifth Amendment and the Lecompton Constitution, But it did incorporate double jeopardy and self-incrimination protections for criminal defendants, mirroring those portions of the Fifth Amendment. See Kansas Constitution Bill of Rights §. 10. And § 18 of the Bill of Rights guaranteed Kansans a “remedy by due. course of law” for “injuries suffered in person, reputation or property,” a provision still recognized to require fair procedures for resolving legal disputes. Harrison v. Long, 241 Kan. 174, 178-79, 734 P.2d 1155 (1987). But § 18 has never been construed to be a repository of unenumerated constitutional rights.[4] The omission from the Kansas Constitution of due process language like that in the Fifth Amendment, especially coupled with the inclusion of double jeopardy and self-incrimination protections, must be seen as the drafters’ exercise of studied consideration rather than as the result of inadvertence. Moreover,, nothing in the Wyandotte Convention debate on § 1 suggests the delegates intended the provision to protect procedural or substantive due process rights rather than to constitutionalize the inalienable rights enunciated in the Declaration of Independence, and championed by tire Republican Parly.
As Judge Leben explains and.I have noted, the Kansas Supreme Court has frequently indicated § 1 and § 2 function at least similarly to tire Equal Protection and Due Process Clauses of the Fourteenth Amendment. The court has consistently considered the two sections as if they were conjoined constitutional twins. But they shouldn’t be treated as more interdependent than any other provisions in the Bill *319 of Rights. And, as I have also noted, § 2 alone can be fairly construed as comparable to the Equal Protection Clause.
Nobody, however, has unearthed a case in which the Kansas Supreme Court has actually relied on § 1 to find and enforce an unenumerated constitutional right to decide a legal controversy. Many of the cases, particularly the early ones, are mishmashes that mention both federal and state constitutional rights and never really explain the actual bases for their rulings. The decision in Brick Co. v. Perry, 69 Kan. 297, 76 Pac. 848 (1904), is illustrative. The opinion referred to § 1, the Fourteenth Amendment, the right to contract, and a natural right prohibiting one person from being compelled to provide personal services to another. 69 Kan. at 299-301. Without mapping out a coherent analytical path through that terrain, the court simply held the statute, prohibiting an employer from discharging an employee because of union affiliation, to be unconstitutional.
Some decisions describing § 1 and § 2 as akin to the due process and equal protection rights in the Fourteenth Amendment decide the disputed issues solely on equal protection grounds and, thus, do little more than mention due process. See, e.g., Tri-State Hotel Co. v. Londerholm, 195 Kan. 748, 759-61, 408 P.2d 877 (1965). Other decisions simply find no basis for relief in § 1 given the facts and, therefore, do not define the nature or scope of its protections. In State v. Wilson, 101 Kan. 789, 168 Pac. 679 (1917), the court found statutoiy limits on the distribution and redemption of trading stamps implicated no fundamental rights protected in § 1 however the provision might be construed. More recently in Manzanares v. Bell, 214 Kan. 589, 522 P.2d 1291 (1974), the court upheld compulsory no-fault auto insurance, rejecting a claim the statutory scheme impaired § 1 rights. The Manzanares decision can be read either to tacitly say § 1 and § 2 provide due process protections or to simply assume as much in rejecting plaintiffs’ arguments. 214 Kan. at 608-09. The negative conclusions in Wilson and Manzanares serve as examples of what § 1 does not protect and offer little to establish what § 1 does protect.
Those decisions do not, however, specifically hold § 1 to be a source of rights otherwise unstated in the text of the Kansas Constitution. *320 So the idea that § 1 is a repository of those rights, thus replicating the substantive due process component of the Fourteenth Amendment, is a jurisprudential abstraction-—a hypothetical possibility that has never been turned into the reality of a ruling. I am disinclined to treat § 1 that way absent a definitive determination from the Kansas Supreme Court, especially when the language and history of the provision offer only scanty support. To reemphasize my earlier point, even if § 1 includes due process protections, they do not squeeze out the inalienable rights expressly identified in the text.
Accordingly, the protection for reproductive freedom in § 1 is materially different from die substantive due process right to privacy secured in the Fourteenth Amendment and the related federal right to abortion recognized in Roe, 410 U.S. at 152-54. Section 1 derives from natural law, a source external to the Kansas Constitution, and is intended to be forward-looking, taking account of societal conditions as they are when the right is invoked. In turn; § 1 effectuates self-determination consistent with an evolving and ever more enlightened understanding of humanity across both race and gender. Conversely, substantive due process encompasses unenumerated or implicit rights that originate within the United States Constitution and are then enforced as “liberty” interests protected in the Fourteenth Amendment. Precisely because those rights have no explicit verbal anchor or identification in any specific constitutional text, they are typically defined through a backward-looking analysis focusing on what has already been accepted over time as a “deeply rooted” part of national history and experience. Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997).
The “liberty” in § 1, however, is simply an example of a natural right. It does not absorb implicit constitutional rights and malee them natural rights protected in § 1. In other words, the liberty of § 1 is simply one expression of self-determination, just as reproductive freedom is another. By contrast, the liberty of the Fourteenth Amendment’s Due Process Clause is a repository for otherwise unexpressed federal constitutional rights. Those implicit rights are not natural rights. So the liberty of § 1 is neither the legal equivalent of *321 nor interchangeable with the liberty of the Due Process Clause. The protections of § 1 would' exist as they are now even if there were no federal substantive due process. In turn, federal law governing substantive due process, including privacy and abortion, has no particular application in construing § 1 either directly or by analogy.
Buttressing the distinction, the Declaration of Independence is not itself a source of enforceable law in the same way the United States Constitution or federal statutes are. The United States Supreme Court does not invoke the language of the Declaration of Independence as controlling authority to resolve legal disputes, including those involving abortion rights. And the framers of the United States Constitution did not transplant language from the Declaration of Independence to create constitutional rights. The ideas set forth in the Declaration of Independence do inform an American tradition or creed that may guide the courts in exploring those values and precepts to the extent they might bear on federal law. Section 1, however, stands on an entirely different footing. As a part of the Kansas Constitution Bill of Rights, § 1 enunciates a positive, enforceable constitutional mandate that shields identified rights drawn from the Declaration of Independence rather than implicit rights originating elsewhere in.the Kansas Constitution.[5]
Along the same fines, § 1 cannot be readily construed to contain a right matching Fourteenth Amendment equal protection. Section 1 refers to “equal and inalienable natural rights,” meaning simply that *322 one person is entitled to no greater measure of those rights than any other person. As a constitutional protection, § 1 broadly prevents the government from affording some people or identifiable groups greater self-determination than others. That is not nearly as expansive as the Equal Protection Clause, which requires a government to treat similarly situated individuals equivalently in all respects absent sound policy reasons for doing otherwise. See Reed v. Reed, 404 U.S. 71, 75-76, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971).
As a matter of textual interpretation, the word “equal” in § 1 describes the phrase “natural rights” to define what the people possess. Eveiybody, therefore, has the same natural rights. That parallels the language from the Declaration of Independence recognizing that “all men are created equal” and expresses the same idea. Section 1 does not establish “equal rights,” on the one hand, and “inalienable natural rights,” on the other, as two distinct sets of rights—a misreading that would at least foster an argument for § 1 functioning in part like the Equal Protection Clause.
IV.
The remaining question before us asks whether Senate Bill 95 comports with § 1 of the Kansas Constitution Bill of Rights. At this stage, Drs. Hodes and Nauser need only show a substantial likelihood that the measure impermissibly impairs the right of self-determination protected there. If so, the district court properly entered the temporary injunction. As Judge Leben has explained, the State does not dispute that Drs. Hodes and Nauser have satisfied the other criteria for a temporary injunction.
Senate Bill 95 effectively prohibits a physician from performing a dilation and evacuation abortion without first stopping the fetus’ heart. The D & E procedure is the most common method of abortion in second trimester pregnancies. Drs. Hodes and Nauser perform D & E abortions beginning in the 15th week of pregnancy. They do not stop the fetal heart before terminating the pregnancy. Some physicians apparently do induce fetal heart stoppage as part of their protocols for performing D & E abortions in pregnancies *323 that have reached 18 weeks, according to the evidentiary record in the district court. [6]
The evidentiary record is quite limited. Drs. Hodes and Nau-ser submitted several written statements, including their own. The statements refer to medical literature from various sources, including journals and a practice guide from the American College of Obstetricians and Gynecologists. The State offered no countering statements but cited some of the same literature and a few other medical publications in its responsive papers to the district court. The district court held a hearing on the temporary injunction at which the lawyers argued their clients’ respective legal positions. Neither side called any witnesses. I presume a merits trial would prompt a more extensive airing of evidence on medical practices for second trimester abortions.
A fetus is not viable until sometime after 20 weeks’ gestation. I take what may be a lay view of viability to mean the fetus has reached a point of gestational maturity to survive with immediate extraction and exceptional medical care even if the woman were to die. (Conversely, and more to the point for my discussion, a nonviable fetus is one that has not reached that stage of development.) The precise gestational point of viability is, as I understand it, open to some debate within the medical community.
The Kansas Legislature has found that “20 weeks after fertilization,” a fetus “reacts to stimuli that would be recognized as painful if applied to an adult human.” The finding is codified in K.S.A. *324 2014 Supp. 65-6722(b). This seems to be a roundabout way of saying a fetus appears to feel pain at 20 weeks’ gestation. The statute also refers to unspecified “substantial medical evidence” that a fetus “is capable of experiencing pain” at that stage of gestational development. K.S.A. 2014 Supp. 65-6722(j). The legislature presumably respects its own findings, and the State cannot jettison that finding in arguing the legislative purpose for or governmental interest advanced in Senate Bill 95. Indeed, in K.S.A. 2014 Supp. 65-6722(k), the legislature specifically claims “a compelling state interest in protecting the lives of unborn children” as they reach that developmental stage. But a legislative recitation of compel-ling interest alone has little legal significance for constitutional purposes. Whether an asserted governmental interest is compelling requires an independent judicial determination. See Shaw v. Hunt, 517 U.S. 899, 908 & n.4, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996) (state “must show” its action furthers a compelling interest); Concrete Works of Colorado, Inc. v. City and County of Denver, 36 F.3d 1513, 1522 (10th Cir. 1994) (whether evidence establishes a compelling interest presents a question of law). Otherwise, legislatures could heavily insulate their enactments from judicial review simply by labeling eveiy statute as serving a “compelling interest” in solving some problem or advancing some policy.
Particularly pertinent here, the State has neither argued prevention of fetal pain as a legislative purpose for Senate Bill 95 nor presented evidence on the issue. At this point, then, for women with pregnancies between 15 and 20 weeks, the D & E procedure aborts nonviable fetuses that no one has shown experience pain. The procedure requires a physician to dissect the fetus within the uterus and to extract the parts through the birth canal. According to Dr. Nauser s affidavit, that usually takes 3 to 10 minutes. Senate Bill 95 effectively prohibits a physician from performing a D & E abortion without first stopping the fetus’ heart. The parties have identified three ways of doing so: cutting the umbilical cord or injecting the fetus with either digoxin or potassium chloride. According to the limited information in the district court record, each of those means is invasive, requiring the insertion of surgical instruments or needles that would otherwise be unnecessary.
*325 The umbilical cord may not be easily accessible in some situations, rendering that method difficult or unavailable. The surgical process carries some risk of injuring the woman if the instruments are mishandled. The evidence does not indicate precisely how severing the umbilical cord then causes fetal heart stoppage.
Digoxin and potassium chloride injections effectively induce fetal heart attacks. Potassium chloride appears to be little used in actual practice. In a written statement submitted to the district court, Dr. Anne Davis, M.D., a physician who teaches at Columbia University and treats patients at the school’s medical center, stated digoxin injection to be the most common means of inducing fetal heat stoppage for a D & E abortion. She explained the injection is administered 1 or 2 days before the abortion and may not be effective, requiring a second administration of the drug. Other times, however, a digoxin injection may cause the woman to expel the fetus before the procedure and, thus, outside a medical facility. The State has cited medical literature indicating that at least some physicians inducing fetal heart stoppage as pai*t of their D & E protocol do so, in part, because the fetal tissue softens and may be more easily extracted. Dr. Davis, however, stated the limited research on digoxin injection “has not shown medical benefits” in abortion procedures.
In summary, the medical evidence presented to the district court indicates that requiring a physician to stop the fetal heartbeat before performing a D & E abortion increases the invasiveness of the procedure and potential risks to the woman and lengthens the overall process—quite substantially for digoxin injections—with, at best, only nominal clinical benefit. Based on the district court record, a D & E abortion performed before 20 weeks does not implicate possible fetal pain or distress. So that can’t be a reasonable justification for requiring fetal heart stoppage before every D & E abortion.
The State’s remaining argument rests on the unaesthetic description of a D &E abortion contained in Senate Bill 95 and in Gonzales v. Carhart, 550 U.S. 124, 135-36,127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007). But aesthetics really cannot justify legislative limitations on safe medical procedures. The lack of justification is *326 even more pronounced when the procedure is integral to a wom-ans constitutional right to self-determination and reproductive freedom. The government cannot impose upon an essential right because some exercise of the right may be unaesthetic or even repulsive to some people. That’s all the more true when those people needn’t see or participate in the protected activity.
The legislative history of Senate Bill 95 also fails to establish a clear purpose for the measure, further detracting from the State’s argument and any judicial obligation to favor it over a constitutional right. Senate Bill 95 contains no findings or statements of legislative purpose. Cf. Pub. L. 108-105 (2003) (extensive congressional findings contained in federal measure banning intact D & E abortions). The House Journal reflects one representative stating he favored Senate Bill 95 because it furthered a governmental interest in protecting “babies” from an inhumane death. Nine other representatives said they wanted to ban abortions and supported Senate Bill 95 as an incremental, though inadequate, step in that direction. House J. 2015, pp. 548-49. Senate Bill 95 passed in the House by a vote of 98 to 26. House J. 2015, p. 548. In the Senate, the measure passed 31 to 9. Senate J. 2015, p. 141. Eleven senators said they voted in favor of Senate Bill 95 because D & E abortion entails a “brutal and inhumane procedure,” the continued use of which “will further coarsen society to the humanity of the unborn, as well as all vulnerable and innocent human life.” Their statement mirrors one of the congressional findings supporting the ban on intact D & E abortions. Pub. L.-108-105 (2003), codified at 18 U.S.C. § 1531 (2012). None of the other legislators voting for Senate Bill 95 offered an explanation of his or her position.
We, then, have no idea why 108 of the 129 legislators supporting Senate Bill 95 did so. But we do know they chose not to join formally in the officially recorded reasons their colleagues expressed. The State, however, effectively says we ought to take the statements of the 21 legislators—about 16 percent of those supporting Senate Bill 95—combined with tire silence of others as reflecting the sense of the majority. But the State’s implication seems quite inappropriate. The silent legislators were just that—silent, and their silence conveys no particular message. Many of them simply *327 may have concluded the political implications of voting yes were likely to be considerably less than for voting no. I cannot infer a particular legislative purpose or governmental interest advanced in Senate Bill 95 based on the Senate and House Journals, the source the State has suggested we review. [7]
The limited evidence presented in the district court and the legislative record offer little in the way of a State interest furthered by Senate Bill 95. Whatever the governmental interest, it would then have to be weighed against the constitutional right of self-determination and the constituent reproductive freedom protected in § 1. This balancing of governmental interest and constitutional *328 protection is uniquely one of Kansas law because § 1 differs from any federal constitutional right. There is no reason to turn to federal abortion law to control or even guide our assessment.
The State, acting through its elected and administrative agents, must respect a persons constitutional right of self-determination and the concomitant freedom it bestows. The right by its very description in § 1 has to be considered fundamental-—an inalienable right embracing life and liberty could hardly be something less. As such, the courts must subject government action impairing the right to exacting review without deference to any legislative prerogative or presumption of constitutionality. See Downtown Bar and Grill, LLC v. State, 294 Kan. 188, 194, 273 P.3d 709 (2012). Even if a statute reflects legislative exercise of police powers, as Senate Bill 95 presumably does, the measure must survive exacting judicial review should it curtail a constitutionally protected fundamental right. Cf. Manzanares, 214 Kan. at 600-01 (recognizing heightened review likely applicable when legislature acts under police powers and resulting statute impedes fundamental right); Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 458, 108 S. Ct. 2481, 101 L. Ed. 2d 399 (1988) (government interference with individual’s “access to” fundamental right “trigger[s] strict scrutiny”). Doing otherwise, in effect, vaults legislation ahead of an elemental constitutional barrier to governmental overreach, undercutting the very purpose of a bill of rights in shielding a select set of fundamental precepts from the vicissitudes of politics and the cravenness of politicians. The State, therefore, gets no thumb on its side of the judicial scale for Senate Bill 95.
At the same time, however, constitutional rights are not impervious to limited legislative constraint in service of a purpose central and necessary to a core function of government. That is, even a fundamental right may be regulated to advance an essential governmental interest, so long as the regulation is carefully circumscribed and does no more than required to advance that interest. The degree of constraint, therefore, must be commensurate with its necessity in advancing that governmental purpose.
By that measure, Senate Bill 95 likely violates § 1 based on the present evidentiary record. The point isn’t really even debatable. *329 Under § 1, prohibiting abortion is not itself a proper government purpose. Any limitation or constraint on abortion must further an established core governmental function, and here the State has the obligation to show how Senate Bill 95 serves such an interest. I am willing to assume prevention of fetal pain rises to that level. But Senate Bill 95 is not carefully circumscribed to further the interest. Consistent with the legislatures own finding, fetuses do not experience pain before 20 weeks’ gestation, so requiring fetal heart stoppage in D & E abortions performed in pregnancies before then cannot serve that interest. Causing fetal heart stoppage offers little or no medical benefit to the woman but expands possible risks associated with the procedure and extends its duration. Medical safety, therefore, is not a consideration.
The remaining legislative justification suggested for Senate Bill 95 lies in an aesthetic aversion for the way D & E abortions are done. Regulating medical procedures based on their purported aesthetics is not a core governmental function. R would seem to be no governmental function at all. The availability of entirely different medical procedures for second trimester abortions is irrelevant, since the legislature has simply dictated how D & E abortions must be performed for a reason wholly disassociated from an appropriate governmental objective.
The district court, therefore, acted properly in temporarily enjoining Senate Bill 95 in anticipation of a trial on the merits of the action Drs. Hodes and Nauser have brought. For the reasons I have explained, I would affirm the district court in so ruling.
⅜ « »

At that time, die United States Constitution empowered state legislatures to select senators. Lincoln and Douglas, thus, addressed the government body that would choose the next senator from Illinois. Not until ratification of the Seventeenth Amendment in 1913 did die United States Constitution mandate direct popular election of senators.

 An astute lawyer and canny politician, Lincoln also was an exceptionally able social engineer and statesman who turned his conceptualization of the intrinsic equality of all people and of governance by consent of the governed into secular American gospel. Those themes repeatedly appear in his public and private discourse, most recognizably in the Gettysburg Address. And Lincoln had long appropriated the Declaration of Independence to that purpose. So his expression of the documents vision may be more nearly his own than Jefferson’s. Lincoln chose his words carefully, especially for prepared addresses, often with profoundly affecting results. In doing so, he also recast the medium of expression with a modernistic style that replaced grandiloquent rhetoric with direct, accessible phrasing. Lincoln, of course, mastered the medium as almost no one else ever has.

 Delegate Kingman, a lawyer, served on the Kansas Supreme Court for about 14 years. A review using modern computerized search techniques indicates King-man wrote no opinions discussing either § 1 or the Declaration of Independence.

 Section 18 requires an adequate substitute remedy if tire legislature limits or abrogates a common-law cause of action. See Bair v. Peck, 248 Kan. 824, 838-39, 811 P.2d 1176 (1991); Manzanares v. Bell, 214 Kan. 589, 599, 522 P.2d 1291 (1974). But tire substitute-remedy principle is quite different from substantive due process and tire recognition of rights not explicitly stated in constitutional text.

 In the Declaration of Independence, the inalienable rights extended to all peoples are said to have originated with “their Creator.” And the Declaration similarly refers to “Nature’s God” in explaining the authority justifying the dissolution of a political union. Section 1, however, omits any reference to the origin of the natural law constitutionalized there. I read little into those editorial differences, as such. The described rights exist outside of and independent of governmental entities, making them natural and inalienable. Apart from that, their origins seem more a matter of philosophy than jurisprudence. Jefferson, the primary author of the Declaration of Independence, is frequently described as something of a deist, acknowledging a supreme being but embracing no particular religion. So the references in die Declaration of Independence do not plainly point to Christian or Biblical teachings as interpretive tools. The absence of any such references in § 1 only underscores the inapplicability of religious dogma as constitutional subtext.

 In abortion challenges decided under federal law, physicians have standing to assert the constitutional rights of their patients. See Isaacson v. Horne, 716 F.3d 1213, 1221 (9th Cir. 2013). Although Drs. Hodes and Nauser rely on state constitutional rights in this case, the parties do not suggest a problem with standing. Especially if substantive federal abortion law is Kansas abortion law, the standing requirements ought to follow, as well. I have no reason to suppose physicians lack standing to assert their patients’ § 1 protections for reproductive freedom, as an independent state constitutional right. Senate Bill 95 would subject Drs. Hodes and Nauser to criminal penalties for continuing to perform D & E abortions as they have. The threat of those sanctions would deter Drs. Hodes and Nauser, directly impairing their patients’ constitutional rights. Those closely intertwined interests, tire nature of the right impaired, and a looming legal injury in-fact to the physicians support standing. See Comprehensive Health of Planned Parenthood v. Kline, 287 Kan. 372, 406, 197 P.3d 370 (2008).

 There is no analytical inconsistency in requiring some direct statement of legislative intent for a specific statute, such as Senate Bill 95, and in drawing meaning for § 1 of tire Kansas Constitution Bill of Rights from surrounding societal conditions, especially absent an otherwise clear pronouncement from the drafters themselves. Elected politicians approve statutes, typically by tire bushel, and stand for reelection on what they have done or failed to do. Intent and purpose may be mixed in tiróse circumstances, since political self-preservation frequently may blend or conflict with loftier policy objectives. In that context, silence rarely can be anything but inscrutable. When the vast majority of legislators are silent about a statute and their support for it, we, as judges reviewing that work, should infer nothing about purpose beyond what the words of tire final bill convey. Had Senate Bill 95 included particular findings as to purpose, we could (and likely should) conclude those legislators voting in favor endorsed the findings absent an express disavowal and statement of some alternative reason.
Section 1 and, to some extent, any constitutional provisions protecting individual freedoms against governmental infringement may be viewed differently. A bill of rights stands as a timeless statement of principles. Statutes typically are neither intended to be timeless nor to pronounce broad principles. Rather, they implement particular policies that can be quite mechanical—speed limits on state highways or tax rates on liquor. Legislators may readily refine or alter statutory policies to suit changing needs or shifting political demands. In marked contrast, the delegates to the Wyandotte Convention went there to perform a discrete task, albeit an extraordinarily significant one. When they completed the task, they were done. They faced no popular vote to continue as delegates. Nor were they expected to reconvene to amend their work. Given the nature of their obligation, we may presume the delegates reflected upon the circumstances surrounding them—a climate unlike any other in the countrys history—in laying out the principles in the Kansas Constitution Bill of Rights. And we may find indicators of their intent and purpose in tiróse extraordinary circumstances.